ALICE HUNT v. ST. LOUIS & SAN FRANCISCO
RAILROAD COMPANY, Appellant.

In Banc, December 1, 1914.

NEGLIGENCE: Contributory: Asleep Near Railroad Track: Train
Violating Speed Ordinance. The defendant's railroad enters
the city of Cape Girardeau 130 feet north of Sloan creek, and
for about 800 feet north of the bridge over that creek the track
is straight. A city ordinance puts the speed limit at five
miles an hour within the city limits. At 1:30 a. m. the defend-
ant's passenger train rounded the curve north of Sloan creek
running forty miles an hour, and when about 700 feet north
of the bridge the engineer saw the plaintiff's husband lying
near the track. The engine struck and killed him while it
was running, the engineer says, perhaps fifteen or eighteen
miles an hour. The plaintiff's petition, in her suit for damages,
contained two counts, the first based on the humanitarian
doctrine, the second on a violation of the speed ordinance. The
jury found for the defendant on the first count, and for the
plaintiff on the second. The defendant alone appeals. Held,
that the judgment must be reversed, the evidence showing
contributory negligence on the part of deceased as a matter
of law, in that he must have been asleep with his head almost
upon the rail. [LAMM, C. J., and WALKER, J., dissenting.]

Appeal from Cape Girardeau Circuit Court.—Hon.
Henry C. Riley, Judge.

REVERSED.

W. F. Evans, Moses Whybark and A. P. Stewart
for appellant.

(1) The case was one of mutual fault, to say the
least of it, and the law will not cast all the conse-
quences on the defendant, nor will it attempt any ap-
portionment of it. Zumault v. Railroad, 175 Mo. 288. In
this case Zumault at night, while waiting for a train, sat
down on the platform and went to sleep, and was struck
by a train. (2) The deceased lived near the railroad,
a few feet from it, and knew of approaching trains, yet

he lay down—all of his body off the track and his head resting on the west rail. He knew that trains would pass, and their time at that point, and plaintiff is not entitled to recover. The law is well settled that where one even negligently places himself in front of a rapidly approaching train and is injured thereby, he cannot recover if the employees in charge of the train used reasonable care to avoid the injury, after they discovered his perilous position, or by the exercise of ordinary care might have discovered it.   Harlan v. Railroad, 64 Mo. 483.  When one wilfully exposes himself to danger and is injured,·there is no liability no matter what the result may be.  Prewitt v. Eddy, 115 Mo. 283; Prewitt v. Railroad, 134 Mo. 632; Moore v. Railroad, 126 Mo. 276; Pope v. Railroad, 242 Mo. 232.

*Edw. D. Hays* and *David B. Hays* for respondent.

(1)   Appellant undertakes to shift responsibility on the theory of mutual fault, along with the suggestion that the law will not attempt to divide or apportion the fault.  But it was within the province of the jury to determine the question of contributory negligence from the evidence offered; and the burden of establishing such contributory negligence was properly rested on the defendant asserting it.  Prewitt v. Railroad, 134 Mo. 615; Thompson v. Railroad, 243 Mo. 336. (2)   Regardless of the facts in the case the defense of contributory negligence is not open to the defendant.  In the answer to the second count of plaintiff's petition, being the count on which plaintiff recovered, defendant did not admit negligence and seek to excuse it.  The answer was an outright denial of any negligence whatever on the part of defendant.  Any plea of contributory negligence must be a plea of confession and avoidance.  Allen v. Transit Co., 183 Mo. 411; Ramp v. Met. St. Ry., 144 Mo. App. 1.  (3)   Violation of such ordinance is negligence *per se.*  Jackson

v. Railroad, 157 Mo. 621; Prewitt v. Railroad, 134 Mo. 615; Hutchinson v. Railroad, 161 Mo. 246; Sluder v. Transit Co., 189 Mo. 107; Stotler v. Railroad, 200 Mo. 107; Sec. 9233, R. S. 1909. A railroad inviting the use of its track for pedestrianism must use care to correspond with the circumstances. Murphy v. Railroad, 226 Mo. 56; Fearons v. Railroad, 180 Mo. 208; Schaaf v. St. L. B. & B. Co., 151 Mo. App. 35; Thompson v. Railroad, 243 Mo. 336.

BLAIR, C.—Plaintiff recovered judgment for $3000 as damages for the death of her husband, George Hunt, and defendant appealed. The petition contains two counts—one invoking the humanitarian doctrine and the other alleging that Hunt's death was due to defendant's negligence in violating an ordinance of the city of Cape Girardeau restricting the speed of trains to five miles per hour.

The answer contained, among other things, a plea of contributory negligence.

At the close of plaintiff's evidence and again at the close of all the evidence in the case defendant requested the trial court to direct the jury to find for it on both counts and excepted to the refusal to do so. On the first count the jury expressly found for defendant and thus denied plaintiff's right to recover on the humanitarian doctrine. The verdict was for plaintiff on the second count, and it is with that count alone we are now concerned. It is contended the evidence pertinent to the issues under the second count is not sufficient to support the verdict rendered thereon.

The relevant facts are as follows: Defendant operates a railroad passing through Cape Girardeau from north to south and entering the city at a point about 130 feet north of Sloan Creek in that city, and an ordinance of the city was in force restricting the speed of trains to five miles per hour within the city limits. On

the night he was killed, Hunt had been drinking and about midnight started home accompanied by two acquaintances. The three proceeded north across the railroad bridge over Sloan Creek and thence along the track a few feet to a point where a cinder path led westwardly from the track, and there, about twenty or thirty minutes after midnight, Hunt's companions left the railroad and went to a brothel where they spent the remainder of the night. When these men left him Hunt "started like he was going on up the track home" and they supposed he did so but gave him no further attention. One of them testified that just before they left him Hunt was "staggering to some extent" and was somewhat under the influence of liquor. About an hour and ten minutes thereafter one of defendant's trains struck and killed Hunt. The train ran 240 to 250 feet farther and stopped. Hunt's body was found very near the spot where his two companions left him but on the west side of the track, a few feet north of a switchstand, his head lying very near the north end of the trestle which forms the north approach to defendant's bridge over Sloan Creek. A bundle of clothing, probably a suit of overalls in which Hunt worked, lay five or six feet north of the body and between the rails. There was a little blood on the west rail and there was a pool of blood west of the track at the point where Hunt's head rested after he was struck. The upper front quarter of the right side of the man's head was stricken or crushed off. There were no other wounds of any consequence on the body. There was no external evidence of previous violence. So far as plaintiff's evidence is concerned there was nothing to show the speed at which the train was running when it struck Hunt unless it can be said to be inferable from the distance the train ran after striking him and the testimony that such a train running ten miles an hour could be stopped in about 150 or 300 feet. There was, however, no evidence for plaintiff tending to show whether

the brakes were applied before, at the time or after the engine struck Hunt.

For defendant the engineer who had charge of the train which killed Hunt testified that the track north of Sloan Creek was straight for about 800 feet; that about 1:38 a. m. he rounded the curve and came out upon this tangent at the rate of forty miles per hour; that when his engine reached a point about 700 feet from the north end of the bridge he saw what he suspected to be a man lying with his head on or near the west rail and near the north end of the bridge and immediately made every effort, consistent with the safety of his train, to stop, but was unable to do so, though he reduced the speed of the train so that it was running about fifteen or eighteen miles per hour when Hunt was struck; that Hunt was lying with his head on a bundle of clothing on or near the west rail, his head partly over the rail; that his face was upward and his body and feet extended westward and away from the track; that Hunt did not move at all but lay supine until the step attached to the pilot, and about four and one-half or five inches above the rail, struck him; that it was this step which inflicted the wound above described, and an examination thereafter disclosed that it was bent and had blood and hair upon it; that the force of the blow turned the body somewhat and turned it partially around.

The violation of a valid and applicable city ordinance restricting the speed of trains is negligence *per se*, and substantial evidence of such violation plus like evidence of a causal connection between such negligence and an injury is sufficient to sustain a verdict against the violator, all issues being properly submitted, unless contributory negligence appears as a matter of law.

**Contributory Negligence: As Matter of Law: Asleep Near Railroad Track.**

In this case the position of the body after Hunt was struck, its nearness to the rail, the nature of the

wound which caused his death and the absence of other wounds save such scratches and bruises as were necessarily incident to his being hurled upon the cinders beside the track, demonstrate that Hunt must, when struck, have been lying with his head on or near the west rail of defendant's track and must have been struck in some such manner as the engineer testified he was. The plaintiff's evidence shows that an examination of Hunt's head disclosed that the "skull was gone down on the forehead just above the eye and the edge of the wound was just about the middle of the forehead, extending upward and backward, including the forward fourth of the right side;" to that extent "the skull was missing; it was cut off on the right side down to the eye-brow just about in the center, about one-fourth of the skull above the ear; not back of the ear to any extent; . . . only a portion of the brain was there." It is inconceivable that a car or engine wheel could have thus crushed or cut a corner out of a man's skull, and it is impossible that Hunt could have been sitting or standing when he received the wound described without receiving others on his trunk and limbs, unless he stood beside the track and held his head out over it, an inference which would destroy plaintiff's case at once. There is no escape from the conclusion that Hunt was lying with his head against or upon the rail. There is evidence on plaintiff's part that he (Hunt) was in good health and there is no intimation that he was subject to epilepsy or any other like ailment. Defendant offered some evidence that Hunt was dead before the engine struck him, but this could not aid plaintiff. The testimony by which defendant attempted to show that Hunt and one Fields were on bad terms was not sufficient to warrant an inference that Hunt had met with violence and had been placed on or near the track, particularly in view of the absence of any external evidences of violence save those naturally incident to the blow delivered by defendant's

engine.  If Hunt was awake and lying on or beside the
track there could be, of course, no recovery.  The only
theory there is really substantial evidence to support
is that Hunt was asleep on or near the west rail of the
track.  Whether he was drunk or sober is, in that event,
of no consequence.  [Murphy v. Railroad, 228 Mo. l. c.
82.]  It is settled law that ''lying down upon a railroad
track is obviously the grossest negligence, which noth-
ing can well excuse'' (2 Shearman & Redfield, Negl. [6
Ed.], sec. 480) and while the humanitarian doctrine ap-
plies to one who has thus exposed himself to injury,
yet the jury in the case found against plaintiff on that
theory, and it cannot be further considered.  One who
lies down and goes to sleep upon the track of a rail-
way over which trains are likely to pass cannot possi-
bly be said to do so in reliance upon the company's ob-
ligation to observe an ordinance limiting the speed of
trains, and the cases cited in which persons were in-
jured while lawfully relying upon such observance are
not applicable.  The negligence of the company in run-
ning its train in violation of the ordinance clearly
would have resulted in no injury to Hunt except for
his own contributory negligence in placing himself, in
the night, upon the track.  Whatever duty defendant
owed persons walking upon the track its violation of
the speed ordinance was but simple negligence in the
circumstances of this case, liability for which is sub-
ject to be defeated by the contributory negligence of
the injured person.

The closing paragraphs in the opinion in Trigg v.
Water, Light & Transit Company, 215 Mo. l. c. 544, lay
down the rule applicable here.  In that case no speed
ordinance was violated but it was contended the rate
of speed was negligent under the common law.  This
difference does not affect the applicability to this case
of the rule approved in that.  A valid ordinance re-
stricting the speeds of trains simply makes a speed vio-
lative of it negligent as a matter of law; whereas, in

the absence of such an ordinance, it is usually for the jury to say whether the rate was a negligent one, all the circumstances being considered.   After the jury find, in the absence of such an ordinance, that a train was moving at a speed which in the circumstances was negligent, the effect of the negligent speed, so far as the question here involved is concerned, is exactly the same as if a speed ordinance had been violated.

The case last cited and that of Sullivan v. Railroad, 117 Mo. l. c. 224, and cases cited, disclose that under the law this judgment must be reversed. *Brown, C.,* concurs.

PER CURIAM.—This cause coming into Banc on a dissent, the foregoing opinion of BLAIR, C., is adopted as the opinion of the court.   All the judges concur, except *Lamm, C. J.,* who dissents in separate opinion in which *Walker, J.,* joins.

### DISSENTING OPINION.

LAMM, C. J.—Plaintiff sued in two counts for the negligent death of her husband.

The first is bottomed on the theory that (because of the customary use of the place by footmen—a bridge or trestle in Cape Girardeau where the defendant maintained a planked footway) it was the duty of defendant to keep an outlook there, but that it neglected its duty; that decedent being exposed to peril there, defendant negligently struck and killed him by running a locomotive against him; that defendant's agents and servants in charge of its locomotive saw decedent in peril, or by the exercise of ordinary care might have seen him in peril, in time to have stopped the locomotive before striking him, but, negligently failing to keep an outlook and failing to stop, struck decedent and killed him.

The train was running very fast, and the testimony tended to show that defendant did keep an outlook and did see decedent, and that though decedent was seen by the engineer lying on the rail the rise of seven hundred feet away, yet the locomotive, at its going rate of speed, could not be stopped in that distance. There was testimony that defendant did what it could to stop, and some from which a contrary conclusion was inferable, but the jury found for defendant on the first count and plaintiff took no exception and no appeal. Therefore trial instructions and theories applicable only to that count fall out of the case.

The second count declared on a violation of a city ordinance forbidding a train speed in excess of five miles an hour within the limits of the city of Cape Girardeau, and ascribes the death of decedent to a negligent violation of that ordinance.

The jury found for plaintiff on the second count and assessed her damages at $3000, but our learned Commissioner reaches the conclusion that because the jury found for defendant on the first count such verdict necessarily precludes a recovery on the second, accordingly the judgment is reversed outright without remanding the cause. I cannot agree that such conclusion is sound and the object of this dissent is to state, in part, my reasons for that position.

I do not say there is no error in propositions of law put to the jury on plaintiff's behalf or in those refused for defendant. I say nothing at all on that score. This for the reason that our learned Commissioner's opinion does not turn on any such question and this includes the reasonableness of the ordinance (a much agitated point in appellant's brief). It lays such question out of view and this dissent does as it does. In other words, if our Commissioner has fallen into error in reaching his conclusion, then other questions remain to be considered before affirmance. If not, then those

other questions are not decisive, and to put them aside and reserve the propositions is well enough.

As premises to reason from, the following may be assumed:

(1)   That the speed ordinance was proved as pleaded.

(2)   That its flagrant violation was proved at the time and by the locomotive in question.

(3)   That there was evidence conclusively showing that if the ordinance had not been violated the accident would not have happened; for on this record decedent was seen by the engineer in a position of peril and (unconscious of it) more than seven hundred feet away, and if the ordinance had been obeyed the locomotive, under existing circumstances of train equipment, weather and grade, could have been stopped in fifty feet. At its actual speed rate it could not be stopped (so the jury found in their verdict on the first count) and warning was unavailing because decedent was unconscious through sleep, sickness or injury by foul means.

(4)   That the *locus in quo* was in the corporate limits of Cape Girardeau sufficiently appears.

(5)   That the locomotive killed decedent sufficiently appears; for that, though there was testimony directed to the theory that decedent was dead when struck by the locomotive, there was also evidence *contra* and the jury decided against defendant on the issue.

We have, then, a case where the death of a man directly results from the violation of a speed ordinance under circumstances where a duty to not kill him, if by ordinary care his death could be avoided, was imperative.

In determining liability or nonliability in the case put, we may put to one side some other issues, *viz.*:

First, the negligence or non-negligence of decedent in putting himself in peril. This issue falls out of

the case on appeal because, on testimony both ways his non-negligence was found by the jury on an issue put to them. Not only so, but admitting decedent's negligence in putting himself in peril an hour before his death and staying in peril, then there is no principle of law allowing him to be killed, *when his peril is discovered and he is unconscious of it,* as here, if by ordinary care his death could have been avoided. This man obviously could not help himself and did not intend to try. No one who saw him could have two opinions on that. It was as plain as a pike staff. Alarms were idle. Stopping was the only thing that would save the unconscious man. In such case decedent was a brother of defendant and defendant was that brother's keeper up to the full measure of ordinary care. I will recur to "ordinary care" further on, and the scope of it as it is given to me to see it.

Second, we may put to one side the duty to stop *at the rate defendant was running its locomotive;* for it could not stop and the jury so decided when it found for defendant on the first count. If, then, ordinary care began only with discovery of peril (which I deny) we confront inability to stop and the case is at an end. But does that view broadly meet the demands of justice or put an end to the case on the second count bottomed on negligent speed in violating the ordinance? So held our Commissioner and at that point we part company.

Because: In the first place, to so hold results in the anomaly that the more the law is violated (i. e., the greater the speed and consequent inability to stop) the greater the immunity from liability for destroying life—an unthinkable proposition. It would be to encourage lawless speed, and the more lawless the better—a theory against all morals and ethics. It would be for the law to say: Break the law, break it flagrantly; for, behold, the more lawless the speed, the

more lawful the killing caused thereby—another unthinkable proposition.

If we ever announce that doctrine we strike the life out of every speed ordinance in Missouri. To illustrate, the object of those ordinances is not only to save life and limb, but to make it possible to save life and limb. But we say, run so fast in towns that you cannot stop where life and limb are likely to be or are in peril, and you are acquit of liability. How long would one of those ordinances be effective in creating a civil liability for negligence in the face of such ruling? A pestiferous syllogism it would be to announce: Ability to stop creates liability. Fast running creates inability to stop. Inability to stop creates immunity. Hence, break the speed ordinance and be acquit.

Nor need we bother with the question of the duty to look out for decedent. The engineer *saw* him, that was one fact on which liability hinges. Closer home, he saw him in time to stop if he had been obeying the law. That was a remaining and necessary fact to fasten liability on defendant. Shall it be allowed to set up its servant's lawless act that it may escape liability and thereby profit by its own wrong? Thereto the maxims are abundant and cover every angle of the matter; for, example: A man should not be benefited by his own wrongdoing. A right does not arise from a wrong. The law hateth wrong. No one can improve his condition by his own wrong. No one can take advantage of his own wrong.

Any process of reasoning leading up to that conclusion must be unsound, because the conclusion is absurd. The right doctrine is: Good reasoning leads to correct results; if, then, the results be incorrect the reasoning is bound to be unsound; for are not the general principles of the law the very perfection of reason?

In the second place, there is no complaint here of improper joinder of causes of action, or that the peti-

tion does not state a good cause of action in each count. If, now, plaintiff had sued in only one count and that one for a breach of the ordinance and had shown, as here, a causal connection between the death and a breach, she would have made a case, barring such contributory negligence by decedent as would be a joint proximate cause of his own death. How comes it, then, that with the first count eliminated by the verdict of the jury her second count by that token alone also falls? Does her case not stand precisely in that event as if she had not sued on her first count at all? I think so and can allow no such potency to the verdict of acquittal on the first count as ascribed to it by the principal opinion, viz., that of striking down both counts and thereby killing two birds with one stone.

In the third place, defendant assigned fifteen reasons for reversing the judgment. Observe what they were. The first four attacked the constitutionality of the new damage act; the fifth complains of the refusal of an instruction whereby the reasonableness of the speed ordinance was put to the jury; the sixth is by way of argument to the effect that decedent went to sleep on the track without relying on a lawful train speed; the seventh argues the ordinance was habitually violated and decedent knew that fact; the eighth puts the matter from the standpoint of a mutual fault; the ninth argues that the doctrine of the Trigg case, 215 Mo. 521, and Ayers case, 190 Mo. 228 (both distinguishable from this), applies; the tenth argues decedent wilfully exposed himself to danger; the eleventh argues that drunkenness did not excuse him; the twelfth complains of an instruction on the burden of proving the issue of contributory negligence; the thirteenth is like unto the last above; the fourteenth complains of another instruction; the fifteenth complains of error in admitting evidence.

To my mind it is of stiff significance that in none of those grounds for reversal did veteran counsel make

the point now made by our learned Commissioner. What *they* could not see with eyes brightened and freshened by the tears (I speak, of course, in figure only) of defeat, should *we* see? Why be astute to that end? Or, if we think we see it, are we not likely to see only a will o' the wisp? Under our rules they were not allowed to argue a point not made in their briefs. Shall we argue it for them?

In this connection I stress the proposition that the contributory negligence of decedent as a causal factor in his death was squarely put to the jury and the fact was found against defendant. In that view of it, shall we say, on conflicting proof, as here, that decedent as a matter of law was guilty of such contributory negligence as destroys liability? One of defendant's theories was that it did not kill the man at all. That he was killed by some one else. That issue was put to the jury and was found for plaintiff. He may have been wounded by an enemy (and the proof made that not a wild speculation) but the locomotive on this record must be taken as the thing that killed him.

Recurring now to ordinary care, all must admit defendant owed it to decedent. It owed him, then, care according to circumstances. It owed him such care as an ordinarily reasonable, prudent man would exercise under the same or similar circumstances. As suggested heretofore the question is: When did ordinary care begin to operate as a factor? The principal opinion, it seems to me, acquits defendant if it used ordinary care in stopping after the peril was discovered. Is not that too close a view? Does not reason push it back of that? It began sooner. Ordinary care *began with the rate of speed* and required obedience to the law so that ordinary care in stopping would have a chance to fill its due office. If, now, disobedience to the law make it impossible to stop, though ordinary care in the mere matter of stopping was used, shall defendant be absolved for carelessly putting it out of its power

to stop? That would be, as heretofore said, an invaluable excuse for lawbreaking. Nay more, and most of all, it would be a suggestion to break the law and thereby escape liability and avoid duty. I think it would make of the law (not a rule of action, but) what some wise old Latin said of the nightingale, viz.: *Vox, et praeterea nihil,* which a scholar tells me means, if liberally Englished, a voice and nothing but a voice. In my opinion ordinary care in this case involved the concept of using ordinary care in speed so that ordinary care in stopping would result in attaining the benevolent purposes of the ordinance. These two phases of ordinary care belong in the case. They are, I submit, inseparable in logic and inseparable in common sense. They sit like "two kings of Brentford on one throne."

Wherefore I dissent, *Walker, J.,* joining me in so doing.