R. N. ALEXANDER, Appellant. v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY.

Division One, July 23, 1921.

1. **NEGLIGENCE: Contributory: Railroad Crossing.** The driver of an automobile, traveling on a public street twelve miles an hour towards a railroad, who, had he looked at any time after he reached a point within fifty feet of the crossing, could have seen a train approached, but did not look, was guilty of contributory negligence.

2. ———: ———: ———: **Looking in Wrong Direction.** Near the railroad track were some bill boards and trees which obstructed a southward view of the railroad track of a traveler on an intersecting public street, until he had passed them and was within fifty feet of the track, and from there on there was nothing to prevent him seeing an approaching train except the telegraph poles, which were about one hundred and seventy-five feet apart, which to a man traveling in an automobile, the traveler testified, would obstruct a view of a passenger train of six cars for a half mile; after passing the bill boards, which were eighty feet from the track, he did not look southward until his automobile, traveling twelve miles an hour, was within ten or fifteen feet of the track; when he was twenty-seven feet from it he could have seen a train coming from the south for a distance of a half mile, but he did not see or hear the train until he was within ten or fifteen feet of the track, which was then too close to stop his automobile before the long train, an hour behind schedule and running from twenty-five to thirty-five miles an hour, would have reached the crossing, and his only chance therefore was to go ahead, but in trying to cross he was struck and injured. The reason he did not look southward for an approaching train after passing the bill boards was that a gentleman riding with him called his attention to some one who was standing north of the street near the track and was hallooing to him, apparently, and this attracted his attention northward and before he ceased to look in that direction his automobile had run sixty-five or seventy feet, which brought him within twelve or fifteen feet of the track. He was intimately familiar with the crossings and obstructions. There was no evidence that, after his peril had been discovered or could have been known by the fireman or engineer, the train could have been stopped in time to have avoided injuring him. *Held*, that, whether the bell was rung and the whistle sounded or not, and whether or not the train was running in excess of ordinance speed, he was guilty of such contributory negligence as bars recovery of damages, and the humanitarian rule has no application to the case.

3. ———: ———: **Ordinance Rate: Violation As Excuse: Reliance Upon Observance.** Contributory negligence is not abrogated or excused by the violation of an ordinance limiting the rate of speed a train may be run within the corporate limits of a city, nor does such violation relieve a traveler on a public street of the city to look and listen for such train as he approaches a crossing; nor where the traveler is guilty of contributory negligence in not looking, when to have looked would have been to have seen the train in time to avoid injury, has he a right to go to the jury on the theory that he might have crossed the track in safety had the train been ob-

serving the ordinance. But said rule does not abrogate the other rule that the traveler who knows of the existence of the ordinance may rely upon its observance, if he does not know it is being violated.

4. ——: ——: **Humanitarian Rule: Inability to Stop Train.** Where the evidence is undisputed that the train, if it had been running at the maximum ordinance speed of twelve mile an hour, could not have been stopped in time to have avoided injuring a traveler at the railroad crossing, after his peril was discovered or discoverable, and the traveler was guilty of contributory negligence in not looking for the train, when to have looked would have been to have seen it in time to have avoided the accident by the exercise of proper care, there is no room in the case for an application of the last-chance or humanitarian rule.

5. ——: ——: ——: **Obstruction by Telegraph Poles.** Testimony that a driver of an automobile cannot see a train of six coaches a half mile distant at any point within eighty feet of the track on account of telegraph poles located one hundred and seventy-five feet apart along the edge of the right of way is so unreasonable and against all common observation and experience as to be devoid of probative force.

Appeal from Jasper Circuit Court.—*Hon. Grant Emerson*, Judge.

AFFIRMED.

*J. D. Harris* for appellant.

(1) The court committed reversible error in directing a verdict for the defendant at the close of the plaintiff's case. The plaintiff's proof abundantly showed that the defendant was negligent in running its train at a speed not only in violation of the ordinance, but at a speed that would be dangerous at such a crossing within the city limits in the absence of an ordinance; that the defendant's servants failed to give warning or signal of the approach of the train by ringing the bell or sounding the whistle. (2) The engineer admits that his fireman by the most casual watch could have observed the plaintiff after he passed out from behind the bill-board,

a distance of eighty feet from the track, and that no alarm was sounded and no effort made to bring the train to a stop or even slacken its speed, until the moment of impact, when he started to set his brakes. The plaintiff's proof shows conclusively that his automobile was traveling at a rate of speed not to exceed twelve miles per hour, The engineer says that he was running better than twenty-five miles per hour, but that if he had been going at the ordinance rate of twelve miles, and his fireman had warned him of plaintiff's approaching the track, with the appliances at hand, he could have slackened the speed of the train to six miles an hour by the time it reached the crossing. With these facts conceded and abundantly proved in this record, there can be no two views in this case, but that if the train had been running at the ordinance speed, the plaintiff would have passed across the track and passed beyond the zone of danger before the engine would have reached the crossing. In approaching the crossing he had the right to indulge the presumption that if a train should be approaching the crossing it would be running in compliance with the ordinance fixing the speed. He had the right to indulge the presumption that if a train were approaching the crossing the bell would be rung, because the crossing was within the corporate limits of the city. In indulging these presumptions he was merely proceeding in the course of a man of reasonable prudence and according to the course of the law, without forfeiting his rights for damages resulting from the defendant's negligence. The plaintiff was not guilty of contributory negligence as a matter of law. The question of the plaintiff's contributory negligence was one for the jury. This position is abundantly sustained by the adjudicated cases of this State. Monroe v. Chicago & Alton Railroad Co., 219 S. W. 68; Maginnis v. Railroad, 268 Mo. 667; Lagarce v. Railroad, 183 Mo. App. 85; Jackson v. Railroad, 189 S. W. 381; Stotler v. Railroad, 200 Mo. 107; Weigman v. Railroad, 223 Mo. 699; Underwood v. Railroad, 190 Mo. App. 417; Donohue v.

Railroad, 91 Mo. 357. (3) Under the statute it is the imperative duty of railroads to have the engine equipped with a bell and to keep the same ringing continuously for 80 rods before reaching the crossing. They do not have, in cities, the alternate of ringing the bell or sounding the whistle, the bell must be rung and continuously, in order to comply with the statute. Mitchel v. Railroad, 122 Mo. App. 50; Donohue v. Railroad, 91 Mo. 357. (4) Contributory negligence to prevent a recovery cannot be imputed to a person because he did not look for the train when his view in the direction it was approaching was obstructed by a row of houses or other obstructing objects. Donohue v. Railroad, 91 Mo. 357; Weigman v. Railroad, 223 Mo. 699; Mitchel v. Railroad, 122 Mo. App. 50. (5) Where the defendant's servants and agents in charge of its train, before the injury, discovered, or by the exercise of ordinary care might have discovered the plaintiff's position of peril, although caused by their concurring negligence, and neglected to use the means at their command to prevent the injury, the defense of contributory negligence is not available. The violation of a municipal ordinance, which regulates the speed of trains, is negligence *per se,* and every person traveling in a public street in a city has a right to presume that the railroad will obey such ordinances, he has a right to rely upon the fact that no train would be run by the railroad at a greater rate of speed than that fixed by the ordinance. It is as much the duty of the railroad's servants to look out for him on the track, or approaching the track, as it is his duty to look out for a train approaching such crossing. Kellney v. Mo. Pac. Ry. Co., 101 Mo. 67, 77.

*W. F. Evans, Howard Gray, Allen McReynolds* and *Mann & Mann* for respondent.

(1) The evidence shows conclusively a clear case of contributory negligence on the part of the appellant, in

that after he had passed the obstruction of the billboard on his right, had he looked he could have seen the approaching train in ample time to have stopped his car and avoided his injury. He is, therefore, precluded from recovery, and the trial court was right in so instructing the jury. McCreery v. Railway, 221 Mo. 31; Sanguinette v. Railroad, 196 Mo. 466; Hayden v. Railroad, 124 Mo. 566; Kelsay v. Railroad, 129 Mo. 362; Huggart v. Railroad, 134 Mo. 679; Kries v. Railroad, 148 Mo. 330; Underwood v. West, 187 S. W. 84; Green v. Railroad, 192 Mo. 131; Mockwick v. Railroad, 196 Mo. 550; Tannehill v. Railway Co., 213 S. W. 818. (2) Mere looking and listening do not suffice. The traveler must exercise care also to make the act of looking effective. He must not approach the track at such a rate of speed that when he reaches the point where he could see the approaching train it is too late to protect himself. 3 Elliott on Railroads, secs. 1164, 1165, 1166; 2 Sherman & Redfield on Negligence, secs. 476, 478; Greer v. Harvey, 195 Mo. App. 11, Hook v. Railway, 162 Mo. 585; Dey v. Railway, 140 Mo. App. 473. (3) The obligation to look is a continuing one and is not discharged when one takes a look at a place from where he cannot see. If there is another position from which he can get a view of the track for his own protection he must avail himself of it. This the plaintiff did not do. Kelsay v. Railway, 129 Mo. 372; McCreery v. Railway, 221 Mo. 31; Walker v. Railway, 193 Mo. 481; Sanguinette v. Railroad, 196 Mo. 494; Tannehill v. Railroad, 213 S. W. 818. (4) The rule of contributory negligence is not abrogated by an ordinance limiting a rate of speed, and the fact that respondent's train was running in excess of the ordinance limit did not relieve the appellant of the duty to look and listen for his own protection, nor entitle him to go to the jury on the theory that he might have crossed safely if the train had been observing the ordinance limit of speed. Weller v. Railroad, 120 Mo. 635; Turner Railroad, 74 Mo. 602; Burge v. Ry., 244 Mo. 76; Stottler

v. Ry., 204 Mo. 639; Hunt v. Ry., 262 Mo. 275; Moore
v. Ry., 176 Mo. 544; Laun v. Railroad, 216 Mo. 579; Green
v. Ry., 192 Mo. 131; Schmidt v. Railroad, 191 Mo. 215.
(5) Neither can the last chance doctrine be invoked
to aid appellant's case. There is no testimony showing
the train could have been stopped in time to have averted
the collision. The absence of such showing is fatal to ap-
pellant on this proposition. Burnett v. Railway, 172
Mo. App. 51; Hamilton v. Railroad, 250 Mo. 722; Sites v.
Knott, 197 Mo. 684. (6) Besides, with the train going
twenty-five miles an hour and the automobile ten or
twelve miles, after the automobile reached the side track
only four seconds would elapse until the collision. Too
short a space of time in which to evoke the last chance
rule. McGee v. Railroad, 214 Mo. 530, 542; Degonia v.
Railroad, 224 Mo. 596; Burge v. Railroad, 244 Mo. 102. (7)
Appellant cannot evade the consequences of his con-
tributory negligence or excuse his negligent failure
to see the approaching train by the attempt in his
brief to invoke the presumption that he relied upon
the train observing the ordinance as to the rate of
speed. He was on the witness stand and testified, but he
failed to state that he relied upon such presumption. He
testified that he was looking and listening for the train;
that he was in this instance, as he had always been,
vigilant. He thereby raised the conclusive presumption
that he was not relying upon the train being restricted
to the ordinance limit of speed. Mockowik v. Railroad,
196 Mo. 571; Reno v. Railroad, 180 Mo. 483; Nixon v.
Railroad, 141 Mo. 439; Bragg v. Railroad, 192 Mo. 321.
Neither could he in any circumstances raise the presump-
tion that although he might have actually seen the train
approaching, he could have assumed that the engineer
was obeying the law; and proceeded on his way on that
presumption, because he testified that when he did see
the train he could tell that it was coming thirty miles an
hour and his witness who had just passed over the track
and saw it coming and was in the same relative position

to it, testified that it was coming thirty miles an hour. What this witness saw, he could have seen, and what he testified himself to having seen rebuts any presumption. Green v. Mo. Pac. Ry. Co., 192 Mo. 131; Laun v. Railroad, 216 Mo. 563. Neither can he be heard to say that where there were no obstructions to his view he looked and did not see, or that it was useless to look because he could not have seen. Knorpp v. Wagoner, 195 Mo. 664; Dean v. Transit Co., 192 Mo. 485; Latson v. Transit Co., 192 Mo. 466.

WOODSON, P. J.—This suit was instituted in the Circuit Court of Jasper County by the plaintiff against the defendant to recover the sum of $25,000 for personal injuries sustained by him through the alleged negligence of the defendant, in running one of its trains of cars against him in the city of Carthage, Missouri.

The trial resulted in the plaintiff taking an involuntary nonsuit with leave to move to set same aside, which motion was overruled, and he duly appealed the cause to this court.

Counsel for the respective parties have made rather an exhaustive statement of the facts of the case, but we substantially adopt that of the appellant for the reason that it presents a clearer and stronger view of plaintiff's case than his own statement does, also presents in a fuller and clearer manner the defendant's case than does that of the plaintiff.

As no question is presented involving the sufficiency of the pleadings they will be put aside, and we shall deal only with the facts as shown by the record, and the law as declared by the court.

The facts are:

Central Avenue runs east and west, and appellant was going east. The railroad runs from the southeast to the northwest, but more nearly north and south. The train with passenger equipment of seven coaches and the

engine, with an average length of something like seventy-five feet, was approaching the crossing from the south, or southeast, and running to the north, or northwest.

The accident occurred on the 26th day of October, 1917, at seven o'clock a. m. The train was one hour late.

The appellant testified in his own behalf that the crossing in question was a much traveled one; that he had lived in Carthage twenty-six years, during all of which time he had been familiar with the crossing and the surroundings; that he had served two terms as a member of the city council, and that at the time of the accident. he was, and for eighteen months prior thereto, had been street commissioner of the city of Carthage. In other words, the testimony admits his entire familiarity and intimate knowledge of the situation at the crossing, as far as the obstruction either to his right or left was concerned, as he approached the place of the accident.

The ordinance limiting the speed to twelve miles an hour was introduced and appellant testified to his knowledge of its existence. He did not testify, however, that he relied upon the presumption that the train would be restricted in its operation to the ordinance speed as it approached the crossing. On the contrary, he says he saw the train and when he saw it it was running not less than thirty miles an hour according to his best judgment at the time.

He testified that as he approached the crossing the speed of his automobile, of which he was the driver, and which contained on the seat with him one passenger, Mr. Hull, was going not less than ten and not over twelve miles an hour, slightly down hill to the track; that his automobile and the brakes thereon were in good condition; that going at that speed he could stop his automobile in fifteen or twenty feet; that he doesn't think he was ever able to stop it in less than a rod going ten or twelve miles an hour. That if he had been going four or five miles an hour he could have stopped his car at ten or

twelve feet; that as he approached the crossing there was quite a tier of billboards that set just off of the street just outside of the sidewalk, some eight feet high and perhaps forty feet long, and that west of that, before you came to the billboards, were houses and buildings and so on; that after you got to the billboards there was considerable brush, limbs of trees, that obstructed the view until you got more than half way from the billboards to the railroad; that the thorn tree which he spoke of was about thirty feet from the south line of the street, and about something like thirty feet east of the billboards; that the body of the tree was right in line with the right of way of the railroad; right in the fence there was a black thorn tree about four or five inches in thickness, twenty or twenty-five feet high, with considerable top to it, beside a good deal of other brush that was along the fence; and the hang-over limbs from trees outside of the railway fence obstructed the view almost entirely until you got from behind the tree; that the tree wasn't close enough to the billboard to obstruct the view, but the trees along the fence hung down to such an extent you could not see up the railroad to any extent until you got past the black thorn tree; that from the thorn tree to the track wouldn't be over twenty-five feet.

That as he approached the track the view to the north was practically unobstructed; that he was at the wheel of his car on the north side thereof; that he was watching for the train; that he was always careful about that as he approached railroad crossings; that as he got somewhat past the billboards referred to, while the trees mentioned were in the way to the south, Mr. Hull, who sat beside him, asked: "Is that fellow hollooing at us," and that he (appellant) looked immediately to the north, the direction in which Hull was looking, and there were a number of railroad men there, not less than one-hundred feet from the street; that he didn't have time to find out who they were calling; that he saw no motion by the men; that he had hardly time to look, running thirty or forty feet, until

Hull said, "Look out;" that he turned his head the other
way and there was a train just off the street not more
than fifty or one-hundred feet away, coming down the
track toward him; that the front wheel of his car had
just 'crossed the side track, and he was so close to the
main track that there was no chance for him to stop
without stopping on the track, and no chance to turn
either way; that he saw instantly what his only chance
was, and the only safety he had was to try to get across
the track, and that was the last he knew.

The testimony by the witnesses show that he was
struck on the crossing by the train, inflicting the injuries
for which he sues.

He testified that he heard no signal, by either the
bell or whistle.  Other witnesses corroborate him in
this respect, but the engineer, whom appellant put on the
stand, testified that the fireman was sitting on the seat
ringing the bell at the time of the accident, and had been
since the time it arrived in the corporate limits; in ad-
dition, that it had whistled for the crossing signal.

He testified on direct examination also that the rail-
road track running southeast is almost entirely straight
for a full half mile and is considerably down grade, and
a train coming down it generally coasts; that there is no
grinding of the wheels and no noise made by the train to
amount to anything; that at the time he discovered the
train the front wheels of his automobile were about
twelve feet from the crossing.

After testifying to the extent or his injuries, he was
cross-examined.  That he was entirely familiar with the
situation of Central Avenue crossing; that he had hauled
gravel from the pit over it ever since he had been com-
missioner, off and on; and had been familar with the
crossing and surroundings for twenty-six years; that on
October 26th the leaves had fallen a little; that there was
nothing to the north to obstruct his view of a train ap-
proaching from that direction; that there were two

tracks to the railroad where it crossed Central Avenue; that the first track which he approached was the switch track and that he knew that that morning; that he had given his deposition in May, 1918, after the accident on the 26th of October, 1917 . (The trial was on the 20th day of November, 1919). That when he had given his deposition he had testified in answer to questions by Judge Gray:

"Q. Do you know how far west of the main track of the Frisco an automobile would be when you could see up the track a quarter of a mile? A. No, I don't know, but it would be guess work with me. I should think about eighty or ninety feet.

"Q. Eighty or ninety feet west of the main track, you had a view of the main track, of a train coming from the south, about a quarter of a mile? A. Yes, sir.

"Q. When you get to the west line of the right of way what would obstruct it? A. There wouldn't be anything.

"Q. When you were about eighty feet from the crossing Mr. Hull said, 'Do you think those men are hollooing to us'? A. Yes, that was his remark.

"Q. Then from that time on until you got over the switch track or about over the switch track, Mr. Hull said nothing to you about the approaching train? A. Not until just as we were running on the switch.

"Q. Then, Mr. Alexander, had Mr. Hull looked to the south any time, he not being concerned with the operation of the machine, from the time those men hollooed until you ran onto that switch, this train coming would have been in plain view? A. Yes."

As to this last question and answer the witness on the stand said he didn't think he answered it as transcribed, but he couldn't say as to how he answered it.

He was then asked regarding his deposition; if the following question and answer given by him at the time were not correct:

"Q. Tell me, how you could have looked between the time you got within eighty feet of that track and the time you got over the switch, without seeing the train? A. I had been looking and listening for a train, and my attention was turned the other way on account of his remark and their hollooing, and I was approaching the track, it takes very little bit, running twelve miles an hour to run eighty feet. I had run perhaps sixty-five or seventy feet during the time."

He said he thought he had answered that way.

He was asked if the following question was not propounded to him in the deposition:

"Q. Now, Mr. Alexander, you said you were looking and listening—when did you look to the south after you got within eighty feet of the track, and when you could have seen the train coming? Had you looked before the time you looked and it was too late? A. I hadn't looked at all."

And he replied that this was correct.

Then he stated again on the stand at the trial that as a matter of fact he hadn't looked to the south, after he got to the end of the billboard eighty feet from the track until his front wheels were across the switch, which he thinks was about twelve feet from the main track, though he had never measured it, and doesn't know whether it was sixteen feet or not; that he had stepped the distance from the main line track to the corner of the billboard, and that it was eighty feet; that he had done this after his deposition was taken.

He admitted that at the taking of his deposition he was asked: "Q. When was it you were looking to the south and listening for a train, and where were you with respect to the billboard on the west side of the track and on the south side of Central Avenue?"

And that he had answered: "A. I was mighty near the point where I should have seen the train; my attention was attracted the other way."

He testified that, if there were no other obstructions when he passed the billboard and got in eighty feet of the track, as far as the billboard was concerned when you get past it you could see up the railroad to the Harrington Quarry, which the testimony shows was several blocks away.

He reiterated he was eighty feet from the main line when Hull spoke to him. He again reiterated that he never looked south after he passed the billboard until he was within twelve feet of the crossing, and that after he had crossed past the billboard if he had looked down the track south he could have seen a train one hundred and fifty feet, and every foot nearer the track it traveled would have enabled him to see farther up the track if he had been looking that way, and then when he was twenty-seven feet from the west rail of the main track that he could have seen a train south for half a mile, except in so far as the telegraph poles would obstruct his view; that the telegraph poles to a man in an automobile would obstruct a train containing six coaches half a mile away.

After other witnesses had testified, the plaintiff was recalled to the stand by his counsel for a further examination, and he testified on direct examination that when he was going down Central Avenue he was looking and watching for trains more from the south than the north, because he had a better view to the north than to the south; that he saw no signal, heard no whistle, heard no noise or any train whatever; that he had been looking and listening more to the south than to the north, although he always watched both ways, and he was asked this question by his counsel:

"Q. How long a time elapsed when your attention was called by Hull of that fellow calling to you, how long an interval of time elapsed when you turned your head in that direction to look, and when you turned it back again on the second statement of Hull's? A. I couldn't say, I shouldn't think more than two or three seconds."

Then on cross-examination he was asked, "If he had looked up the track south when fifty feet from the main track, if he could not have seen down past the light plant?" .Answer, "Well, there would have been some obstruction in the way; it is hard to see a train or anything of that kind, in an automobile when it is moving;" and that if he had been stopped, his view would have been practically unobstructed, except by the poles; that after he passed the billboard everything else was off the right of way, except the poles.

After he had complained about his view being obstructed by the poles he was asked: "Q. You think the seven-car train would be cut off from your view by telephone poles 173 feet apart?" His answer was,. "To a great extent in an automobile."

Dr. Webster testified to the extent of plaintiff's injuries, which testimony is immaterial here.

P. S. Vance testified that he, driving a wagon, had crossed this crossing just a head of the appellant and after passing over the crossing noticed the approaching train coming toward him, at a rate of speed, in his judgment, at thirty or thirty-five miles an hour. His cross-examination shows that he had reached a certain point after observing the train when he heard the collision, which was almost one-third of the distance that the train was from the crossing when he saw it approaching (his team going about four miles an hour).

He also testified that the obstruction of.the thicket up there on that knoll prevented you seeing the train coming down the track until you would be almost on the track.

On cross-examination he testified that the knoll in question was away up at Third Street two blocks away. Other witnesses testified as to the extent of plaintiff's injury, and that the speed of the train was twenty-five or thirty miles an hour.

J. W. Meredith was the only other witness except the engineer who testified as to the view of the appellant as he approached the track. He said that according to his remembrance there was quite a board fence that ran pretty close, he couldn't say how close, and some brush and things along down there next to the road and some trees that had grown up there.

"Q. State whether or not this obstructed the view there at that time. A. Well, yes, to some extent of course."

On cross-examination he said that on account thereof the view wasn't exactly plain for a person going down; that the trees were in the right-of-way fence.

There were no photographs introduced in evidence, but they were used in the examination of the witnesses, and the testimony of the witnesses show that they admit that they showed an unobstructed view after the billboard was passed.

Appellant introduced Price Parmlee, in charge of the locomotive that struck his car, as a witness. He testified that the train consisted of engine, tender, six or seven passenger coaches; that they were an hour behind time and running twenty-five miles an hour; that the whistle was blown for the crossing signal at the Missouri Pacific crossing, and that the bell was rung the entire time after entering the corporate limits until the collision; that the automobile came onto the crossing from the fireman's side; that he, the engineer, did not see or know anything of it until his attention was called to the fact by the fireman, which was just before the crossing was reached, right against it, and that he immediately commenced setting the brakes; that there was a heavy train of seven cars; it had already whistled for the station, and that the application of his brakes as they approached the Missouri Pacific crossing had more or less exhausted his air.

Plaintiff's attorney on re-direct examination drew from this witness the statement that if he had been running twelve miles an hour he could not have stopped sooner than half the train length, the length of three cars at the least calculation; that twelve miles an hour would take less space within which to stop than twenty-five; that his fireman was sitting on the seat box ringing the bell and looking ahead, and that watching he could see the automobile as soon as it came out from behind the billboard; and that if he had been notified of the approach of the automobile as soon as that occurred, and he was within one hundred feet of the crossing, he could have applied the brakes and slackened the train some by the time he got to the crossing, a little bit, if he had seen it, but not down to five or six miles an hour; perhaps he could have slowed down to six miles an hour; that you can't apply the brakes in a second, that it takes a little space to get into communication with the fireman after he discovers it.

He testified that if the fireman had known when the man was eighty feet away that he wasn't looking, wasn't going to take care of himself, he, the engineer, could not have received notice and applied the air and stopped the train before reaching the crossing.

After the engineer's testimony, appellant called O. C. Donehay as an expert witness. He testified that the average length of a passenger coach was seventy-five or eighty feet, some of them longer. This expert testified that the engineer, after the fireman told him of the approach of the automobile, could, in his judgment, have stopped the train in two train lengths, which would have been a pretty good stop at twenty-five miles an hour; and that if he had been going at twelve miles an hour under the same conditions, could have stopped the train within five hundred or six hundred feet.

I.  The first contention of counsel for appellant is that the trial court erred in declaring as a matter of law that he was guilty of such contributory negligence as to prevent his recovery in this case.  In support of this contention we are cited to the following cases:  Monroe v. Chicago & Alton Railroad Co., 219 S. W. 68; Maginnis v. Railroad, 268 Mo. 667; Lagarce v. Railroad, 183 Mo. App. 70, l. c. 85; Jackson v. S. W. Mo. Ry. Co., 189 S. W. 381; Stotler v. Railroad, 200 Mo. 107; Weigman v. Railroad, 223 Mo. 699; Underwood v. Railroad, 190 Mo. App. 407, l. c. 417; Donohue v. St. L., I. M. & S. Railroad Co., 91 Mo. 357.

The appellant testified that there were no signals given of the approach of the train that struck him, and he was corroborated in that statement by other witnesses; he also stated that he was perfectly familiar with the crossing where he was injured, and the conditions and surroundings there, and had been for many years.

He also described a certain billboard and a locust tree and some brush which obstructed his view of the train until after he passed the east end of the billboard, which was eighty feet from the main track, and that after reaching that end, the tree and the brush mentioned still partially obstructed his view of the train until he reached a point about fifty feet from the track, and from there on there was nothing to obstruct his view except the telegraph poles, which were something like one hundred and seventy feet apart; that after passing the east end of the billboard he did not look south again until he ran his automobile some sixty-five or seventy feet, which brought him within ten or fifteen feet of the main line track.  When he was twenty-seven feet west of the rail of the main track, he could have seen the train coming from the south for a distance of a half a mile, except in so far as the telegraph poles would obstruct his view; that the telegraph poles to a man in an automobile

would obstruct a train containing six coaches for a dis-
tance of half a mile.   He was driving his auto-
mobile at twelve miles an hour and could stop it
in twelve or fifteen feet.   He never saw nor heard
the  train until he was within ten or twelve feet of the
main track, which was too close to stop his car before the
train would have reached the crossing, so he then tried
to cross the track in front of the approaching train and
was struck by it and injured. The reason why he did not
look south for the train after passing the end of the bill-
board was that Mr. Hull, the gentleman riding with him,
called his attention to someone calling to him, who was
north of the track, which attracted his attention in that
direction and before he got through looking in that di-
rection his automobile had run some sixty-five or seventy
feet, which brought him within twelve or fifteen feet of
the crossing.

Under the authorities cited counsel for appellant
contend that the evidence mentioned made a case for the
jury, and that the court erred in declaring as a matter
of law that he was guilty of contributory negligence, and
was not entitled to a recovery. .

We shall briefly consider those cases:

In Monroe v. Chicago & Alton Ry. Co., supra, the
plaintiff, as he approached the crossing in his automo-
bile, actually looked towards the approaching train at
a time when he could see and did see enough of the track
in the direction of its approach, and saw that there was
no train on it, and that it was impossible for a train to
come within his view running at the ordinary speed
limit and to strike him before he could have cleared the
track; from that point to the crossing his view was com-
pletely obstructed.   The court in that case properly held
that the plaintiff made a case, but no such facts appear
in this case; the appellant never looked, and had he
looked at any time after he reached a point within fifty
feet of the crossing he could have seen the approaching
train.

Maginnis v. Mo. Pac. Ry. Co., supra, was decided upon the humanitarian doctrine. In that case the evidence shows that the engineer was looking directly at the deceased when he was sixty feet from the crossing, and could see that he was oblivious to his danger, but gave him no warning whatever. It was true Maginnis was guilty of contributory negligence which barred his right to a recovery, but for the fact that the engineer had the last clear chance to save his life after observing his negligence and peril, but negligently failed to avail himself of that chance. This record presents no such case as that.

The same facts were involved in the case of Lagarce v. Mo. Pac. Ry. Co., supra, as were those in the Monroe Case, supra. In that case plaintiff had the last clear view of the track when he was forty feet away. He saw enough of the track to show that train approaching at a lawful rate of speed could not reach the crossing until he had ample time to get over it. That is not true in this case.

Nor is the case of Jackson v. S. W. Mo. Ry. Co., 189 S. W. 381, in point. In that case Jackson was approaching the crossing at right angles, and when in about fifty feet of it he got his first possible view of the approaching car, which was some one hundred and fifty feet away, which was the limit of his vision. Jackson and the motorman exerted themselves to the utmost to stop and avoid the collision, but neither was able to do so. No signal of the approaching car was given. It was held that Jackson could not as a matter of law be guilty of contributory negligence, because both he and the motorman testified that after he got the first possible view of the approaching car he tried to avert the collision. In the case at bar the appellant could have seen the approaching train, for a distance of half a mile or more, had he looked in that direction after he reached the end of the billboard, and especially when he was about fifty feet from the crossing. Nor is the case of Stotler v. Railroad Co. in point. In that case the defendant was operating its train in excess

of the speed limit, which was eight miles an hour, but in discussing that case the court, on page 146, said:

"Now if this case be viewed from the standpoint of plaintiff's evidence, she is presumed to have looked and listened and to have seen and heard the train. If it be viewed from the standpoint of defendant's evidence, she actually did see the train when it was forty rods away and she was still in a place of safety south of the track. The case then has progressed to the point where fault can be found with the plaintiff, if at all, not in her not looking and listening, in her not seeing and hearing the advancing train, but in the act of driving on the track immediately before the train. The act in question was not hers, but if she actually participated in that act or is responsible therefor she ought not recover."

The court then proceeded to show the tender age of the plaintiff, her reliance upon her mother who was the driver, and on that theory alone held that she was not guilty of contributory negligence as a matter of law. And it may be inferred from the opinion in the Stotler case that the mother, who was driving the vehicle, would have been barred as a matter of law by her contributory negligence.

In Weigman v. St. L. Iron Mt. & Southern Ry. Co., the plaintiff was held not guilty of contributory negligence, as a matter of law, because there was an engine and train of cars on the side track which prevented him from seeing the approaching train until his horses' feet were on the track, the train having given no signal of its approach.

The Underwood Case is similar to the Weigman Case, and was disposed of upon the same principle. That case quotes from the Campbell Case the following language:

"In this case the boy had a right to expect that there would be headlight (signals) on any car on that road, and if he looked in both directions as he approached the track and saw no headlight (heard no signals), and if he then concluded for that reason that there was no car

coming and drove on the track, the court had no right to say, as a matter of law, that he was guilty of contributory negligence.''

The trouble with the case at bar is that the appellant testified that he never looked in the direction of the approaching train after the billboard was passed until he reached a point some twelve or fifteen feet from the crossing.

The case of Donohue v. St. L. Iron Mt. Ry. Co., 91 Mo. 357, is analogous to the last considered case. Touching the right of the appellant to rely upon the presumption that respondent was limiting the speed of the train to that prescribed by the ordinance, the case of Kellney v. Mo. Pac. Ry. Co., 101 Mo. 67, cites the Donohue Case and holds that:

''If Kellney had been in a position where by looking he could have seen the approaching train and could have seen that it was running in excess of ordinance speed and at such a rate that if he went on the track he would be struck before he could get off he could not recover.''

In the case at bar Alexander admits and his other witnesses testify to the rate of speed, and as we have heretofore said there is no presumption left in the case on that proposition.

In the consideration of this case counsel for the appellant seems to assume contributory negligence is abrogated or excused by the existence of an ordinance limiting the rate of speed a train may run in a city, where the train has violated the ordinance, and that in consequence thereof the appellant was relieved of all duty to look and listen for its approach and was therefore entitled to go to the jury upon the theory that he might have crossed the tracks in safety had the train been observing the ordinance.

That is not the law of this State. He was still chargeable with contributory negligence, in the same degree as if no such ordinance was in existence. (Of course I do not mean to convey the idea that if such an ordinance exists, and a person knows of its existence, he may

not rely upon its observance, if he does not know that it is being violated). The following cases are authority for the legal proposition before stated: Weller v. Railroad, 120 Mo. 635; Turner v. Railroad, 74 Mo. 602; Burge v. Railway, 244 Mo. 76; Stottler v. Railway, 204 Mo. 619, 639; Hunt v. Railway, 262 Mo. 271, 275; Moore v. Railway, 176 Mo. l. c. 544; Laun v. Railroad, 216 Mo. 563, 578; Green v. Railway, 192 Mo. 131; Schmidt v. Railroad, 191 Mo. 215.

II. It is not seriously contended by counsel for appellant that he was not guilty of contributory negligence, but seeks to escape the effects thereof by invoking the last chance doctrine.

He put the engineer on the stand who testified that he could not have stopped going at the rate of speed he was traveling in time to have averted the accident. He then proves by the engineer that if he had been going at the ordinance limit, twelve miles an hour, he could not have stopped in time to have averted the accident. He proves by the engineer, who was on the opposite side from appellant as he approached the track, that after he became aware that he was not going to stop in the clear, as any one seeing him would have every right to presume he would do, he did all he could to stop in time, and failed to do so.

There was no evidence introduced tending to contradict the testimony of the engineer, or that the train could have been stopped in time to have averted the injury after the appellant was in apparent place of danger.

It is true that appellant, in a kind of off-hand way, stated that a man in an automobile could not see a train of cars within a distance of half a mile approaching the crossing in question from the south, at any point east of the end of the billboard mentioned and west of the crossing, on account of the telegraph poles, which were one hundred and seventy-five feet apart, which would be about fifteen poles, set in the usual and ordinary way.

This testimony is so unreasonable and against all common observation and experience, we deem it unworthy of further notice. There is no probative force in it whatever, and the trial court probably refused to submit it to the jury upon the ground that it was against the physical facts in the case.

For the reasons stated we are of the opinion that the trial court properly declared as a matter of law that the appellant was guilty of contributory negligence and that he could not recover.

Finding no error in the record the judgment is affirmed. All concur.