GUSTAFF DUCOULOMBIER v. GUY A. THOMPSON, Trustee MISSOURI PACIFIC RAILROAD COMPANY, Appellant.—124 S. W. (2d) 1105.

Division One, February 8, 1939.

992

*T. J. Cole, F. M. McDavid, F. W. Barrett* and *Neale & Newman* for appellant.

*Franklin E. Reagan, Harry G. Waltner, Jr., Wm. J. B. Myres* and *F. P. Sizer* for respondent.

HYDE, C.—This is an action for damages for personal injuries caused by a switching movement of defendant's cars. Plaintiff was injured while between two cars, sweeping up loose wheat for his own use near the ends of the ties of defendant's switch track. He had a verdict for $10,000. Defendant has appealed from the judgment.

This case was previously tried and plaintiff obtained judgment for $7500, which was reversed and remanded by the Springfield Court of Appeals. [Ducoulombier v. Baldwin, 101 S. W. (2d) 96.] Reference is made to that opinion for the pleadings and for the evidence in the case before the Court of Appeals. Defendant now, after retrial, contends again that its demurrr to the evidence should have been sustained. The Court of Appeals correctly decided that, unless his presence was actually discovered, there was no duty to look out for and warn him or others, who might be gathering for their own use wheat spilled around the tracks, before moving cars in defendant's yards. [Angelo v. Baldwin, 343 Mo. 310, 121 S. W. (2d) 731, and cases cited.]

The Court of Appeals in remanding this case said:

"There was some question as to whether or not the plaintiff was in a position of imminent peril, but under the combined testimony of plaintiff and witness Weed, giving the testimony of these two the most favorable inference on behalf of the plaintiff, as we are required by law to do, we must hold there was a jury question as to whether or not defendant's brakeman discovered plaintiff in a position of imminent peril; and thereafter failed to warn him of his intention to move the cars under which he was gathering up wheat, and whether the act of the brakeman in failing to notify plaintiff of the impending movement of the cars was negligent."

Plaintiff's theory in the last trial was that one of defendant's switchmen actually saw him between the cars just before he signaled for the movement which it is claimed caused plaintiff's injuries. Both parties tried the case as though the humanitarian negligence doctrine was applicable and all instructions of both were confined to that theory. Plaintiff's evidence again consisted only of his own testimony and that of Dennie Weed, his nearest neighbor. Both lived close to defendant's yards. Plaintiff had been an employee in these yards, and had worked in them over a period of many years. He had not

been working for some time prior to his injury. Defendant's yards had switch tracks which ran east and west, and were numbered from north to south. (No. 5 was farthest north, and No. 37 farthest south.) These tracks were about one mile in length but curved slightly near the center. They were 13½ feet apart from center to center. The east and west sides of the yards were both higher than the center, so that a car switched in at either end would run by gravity to the center. There was a large grain elevator at the east end of the yards, and large quantities of wheat were being moved into these yards.

Plaintiff testified about the occurrence, as follows:

"I was there in the morning, I went up there and looked for a little wheat, early, about around six o'clock maybe a little after, and I swept me a little wheat, and I went back home. . . . After I went home and ate breakfast I went back. . . . I was about three tracks away from No. 12, south from No. 12 track, and I look along the cars and I see a little wheat laying there, small pile, leaked out of the car, and I went up there and swept it up. . . . I was setting down on one knee. . . . I was setting between the two cars in the opening between the two. . . . Q. Who did you see? A. See Dennie Weed come by there. . . . He was going east.
. . .

"Q. Now, did you see Dennie any more that day, Dennie Weed? A. Yes, sir. Q. Where did you see him the next time? A. Well, I see him when he go back. Q. Which way was he when he went back, which side of the car was he on when he went back? A. North. Q. North, and which side was he on when he went east? A. On the south side. Q. Did you see anybody else there besides Dennie on the north of the car? A. Yes, sir. Q. Who did you see there? A. There was a switchman there on the north side. . . . Q. How often have you seen him switching there before? A. Oh, quite a little while; I have seen him there lots of times. Q. Now, did he stop when he went— A. Yes, sir, stopped and talked to me; . . . said, 'You got any luck?' I said, 'Yes, I find a little wheat there,' and I look up and he kept on going. . . . Q. Now, which direction did he go, if you know? A. West. . . . Q. Did you see the switchman first or did you see Dennie Weed first, on the north side? A. I see the switchman just when he talked to me, . . . he walk away, Dennie come by. . . . Q. And how long was it after the switchman left until you saw Dennie? A. Just like he left, Dennie walk right by. . . . Q. Was there any engine in the west when you went in underneath and between this car? A. No. Q. Now did you look east for an engine? A. Uh huh, looked both ways. Q. Could you see east? A. No, couldn't see it. Q. Why didn't you see it, Mr. Ducoulombier? A. The tracks curve. . . . Q. Now, Mr. Ducoulombier, you say the brakeman walked on west?

A. Yes, sir. Q. How long was it before the cars were moved, after he walked west? A. Oh, I will say maybe it was about fifteen or twenty, twenty-five, thirty seconds, maybe something like that; he wasn't gone very far before the cars jerked west and knocked me over. Q. Which way were the cars moved? A. West. Q. Now what position were you in, Mr. Ducoulombier, when the cars struck you and hit you? A. I was hit in the same position, all the time scratching that wheat up, one knee down and one knee up, about eighteen inches from the rail, twenty or something like that. (The sill step struck his shoulder.) Q. Now with reference to the position that the switchman saw you, were you in approximately the same position? A. Yes, sir. . . .

"Q. Now after the car run over your right foot, what did you do, Mr. Ducoulombier? A. I crawled away; crawled about two tracks away south and hollered for help. . . . I see that same switchman coming across there and he asked me if I got hurt and told him, I say, 'I had my foot cut off.' . . . He was one of the first men there. . . . Q. Well, did he climb over the coupling? A. I don't know, I could not say that he did, I didn't see him climb across the coupling. . . . Q. Did you see some other men there, too? A. Yes, sir. . . . Q. I am trying to find out who got there first. A. That man got there first. . . . Q. This one man got there first—when did you first see him? A. When he come across there. Q. Across where? A. About seven or eight cars away from me. Q. Did he come across that string of cars? A. I couldn't tell you, he was there on the south, when I hollered. Q. You didn't see him come across the cars at all? A. No, he was other side of the cars. Q. Was that the brakeman you saw pass the cars when you were between them? A. Yes, sir, it was. Q. Same fellow? A. Yes, sir. Q. How many cars west was he from you? A. About maybe five or six cars when I first saw him. Q. How far back were these other men that came on down? A. Them that was on the west end? Q. Well, how far? A. Maybe about fifteen cars, the end of it. Q. Down at the end of the string of cars? A. Yes, sir. Q. And they came right on up? A. As soon as I hollered they come at me. . . . Q. Now, you testify here that that brakeman came up first and then afterwards the other men came? A. Uh huh. . . . Q. The brakeman was quite a bit ahead of them? A. He was ahead of them other fellows. . . . Q. You don't know what engine this man that passed by those cars when you saw him at the time you got hurt, what engine he was connected with, do you? A. That man? Q. Yes? A. No."

Weed testified that he saw plaintiff "gathering a sack of wheat between the ends of two cars" on track 12, about fifteen cars from the west end of the string, which contained thirty or forty cars in

all, as he "was going east." He was in the yards for the same purpose as was plaintiff. He "went down several car lengths, three, four, five car lengths" and "got my sack of wheat;" then "came back west towards home" on the north side of the cars walking along on track 10, carrying his sack "across my shoulders, ahold of each end." He said that he saw a switchman ahead of him on that side of the cars.

Weed further testified, as follows:

"Q. Was the switchman east or west of you? A. West of me. . . . Q. Now how far ahead of you was he, that is, how much farther west was he than where you were? A. Well, possibly a car length, I don't just remember, but I was over two tracks north of where they were. . . . Q. Did you see the switchman do anything? A. I seen him give signs to back up. Q. Before that did you see him do anything? A. He said something to Ducoulombier. . . . Hesitated and said something to the man that was getting the wheat. . . . Q. Now what was Ducoulombier doing when you saw him the second time as you walked west? A. Well, he just pretty near had his sack full of wheat. Q. And how was he getting his sack of wheat? A. Pawin' it out between the ties; just finishing up. . . . Q. Now, how long was this brakeman standing there talking through the cars to where Dusoulombier was sitting—how long was he there? A. Well, I was coming up on this track over here and I seen him hesitate there and say something to that man, Mr. Ducoulombier, and then he started up. . . . Q. You didn't hear what was said? A. No. . . . Q. Started west; how far did he go? A. Well, he was half a car length, he might have been a car length from me. . . . Q. Now, what kind of a signal did he give? A. He was giving a back-up signal. Q. A back-up signal? Which way did the cars move, if they did move? A. They moved west. . . . Q. Now, which direction did you go then after you saw that? A. I went towards the end of the cars then. Q. Went to the end of the cars? A. Where the engine was attached on. . . . Q. Where was the engine? A. Well, it was attached to this string of cars. Q. And where was it, on the east or west end of the cars? A. West end of the cars. . . . Q. Now, did you know Mr. Ducoulombier had been injured at that time? A. No. Q. Did you hear any outcry? A. No."

On cross-examination Weed further testified, as follows:

"Q. You went on down. Where did the trainman go? A. He went on down. Q. How far ahead of you? A. Well, he just kept going; I just kept going, too. Q. You never caught up with him? A. No. Q. How far was he ahead of you? A. Oh, he was probably a car length. . . . Q. Where did he go? A. He went to his engine. Q. Down at the west end? A. Yes. Q. Then he went the full length of the train? A. Yes. Q. And did you see him

get on the engine or connect himself with it in any way? A. I didn't see him get on the engine, but I seen him at the engine. Q. You watched him then as far as to the engine; you know that he got to the engine? A. Yes. . . . Q. Did you see the men uncouple the engine from the cars? A. I didn't see them pull the pin, but I saw the engine back away from the cars. Q. Now then you went on down there and you went around the cars, the string of cars? A. Yes, sir. . . . Q. Now fifteen cars back where Gus was didn't you hear any hollering down there? A. No. Q. Didn't you see men hurrying down there in a squad—bunch? A. No, I didn't see nobody hurrying. Q. You didn't have any idea where that engine was going? A. Not the least in the world. Q. You didn't see a lot of men just ahead of the engine hurry on down that way? A. No. Q. Didn't know Gus was hurt at all? A. No. . . . Q. You hadn't gotten up to where Gus was then when he gave these signals? A. No. Q. Did he give these signals before he left where Gus was or afterwards? A. Started giving them right then. . . . Q. And didn't you testify there just a while ago on this trial he was a car length away from Gus when he gave the signals? A. He was a car length. . . . Q. And now you say he was where? A. As he was leaving Gus he began giving signals. Q. Tell me how many feet he had gone before he commenced giving signals to the crew to back that train? A. Four or five feet, just got away from that opening. Q. And you were just about even with the opening? A. Almost. Q. And you saw him giving signals to the crew that meant those cars were going to be moved? A. Yes, sir. Q. And you knew Gus was down there where you said he was? A. Yes, sir. Q. Why didn't you holler, 'Gus, look out,' he was moving the car? A. Trainman's place to tell him. Q. Why didn't you tell him? A. I suppose the trainman had told him that. Q. You knew he was between the cars and you knew the man was going to have the cars moved and you never told Gus? A. No. Q. And why didn't you? A. I just told you I supposed the trainman was going to. . . . Q. Gus is a good friend of yours and you are a good friend of his, of course you would protect him from any danger if you saw he was in danger, wouldn't you? A. Yes. Q. Why didn't you tell him the cars were about to move? A. Trainman's place to tell him that. Q. Why didn't you tell him? It wouldn't hurt you to do it, would it? A. I thought the trainman would have told him and I just went on with my wheat."

Weed did not know the switchman or anyone at the engine he saw except a man who had died prior to the trial. Weed said that he could only see one hand of the switchman when he gave the signal, because his view to either side was obstructed by the way he was carrying his sack "ahold of each end across your shoulders." Weed crossed

track 12 at the west end of the cars and went on home. He saw the engine moving east on a track farther south as he left. He also said that he did not learn that plaintiff had been injured until "probably an hour" after he left the yards. He did not fix the time when he was in the yards except that it was in the morning. Defendant's evidence was to the effect that the movement which caused plaintiff's injury was caused by cars shoved on track 12 from the east by a switching crew working at the east end of the yards. This crew could not see plaintiff on the south side of the cars because of the curve in the switch track. It was further shown that there were car inspectors working near the string of cars where plaintiff was gathering wheat; that there was no switch engine on track 12 at that time; and that the west end engine was working on tracks 14 and 15.

▉ Plaintiff says that the question of whether he made a jury case was settled by the decision of the Court of Appeals. "There are exceptions to the rule" that "matters decided on one appeal will be considered settled on a second appeal in the same case." Thus "if a mistake of fact has been made on the first appeal, or the decision on said appeal is an injustice to the rights of the parties, correction will be made on the second appeal." [Dunn v. Alton Railroad Co., 340 Mo. 1037, 104 S. W. (2d) 311.] Moreover, the Court of Appeals had discretion to remand the case for another trial where plaintiff had tried the case on an erroneous theory, or even if there had been a defect in plaintiff's case, if it had appeared from the record that evidence might be available to make a case on the correct theory or to supply the defect. [Markley v. Kansas City Southern Railroad Co., 338 Mo. 436, 90 S. W. (2d) 409; Myers v. Union Electric Light & Power Co., 334 Mo. 622, 66 S. W. (2d) 565.] We will, therefore, consider the question of whether plaintiff produced substantial evidence on this trial to make a jury case.

▉ It is obvious that plaintiff's testimony alone did not make a case, because it did not show that the man who talked to him had anything to do with moving the cars. Plaintiff was in the yards gathering wheat that morning on more than one occasion. We think Weed's testimony is too indefinite, unreasonable, and self contradictory to identify the occasion when he walked west along the north side of the cars taking his wheat home, with the time and movement when plaintiff was injured. [See Steele v. Kansas City Southern Railroad Co., 265 Mo. 97, 175 S. W. 177; Kibble v. Q., O. & K. C. Railroad Co., 285 Mo. 603, 227 S. W. 42; Alexander v. St. L.-S. F. Railroad Co., 289 Mo. 599, 233 S. W. 44; Monroe v. C. & A. Railroad Co., 297 Mo. 633, 249 S. W. 644, 257 S. W. 469; Clark v. Atchison & Eastern Bridge Co., 333 Mo. 721, 62 S. W. (2d) 1079; Carner v. St. L.-S. F. Ry. Co., 338 Mo. 257, 89 S. W. (2d) 947; Tate v. M.-K. & T. Railroad Co. (Mo.), 93 S. W. (2d) 873; Dunn v. Alton Railroad Co., 340 Mo. 1037, 104 S. W. (2d) 311; State ex rel. Kansas

City Southern Railroad Co. v. Shain, 340 Mo. 1195, 105 S. W. (2d) 915; Mahl v. Terrell, 342 Mo. 15, 111 S. W. (2d) 160.] We must consider in this connection plaintiff's testimony that there was no engine coupled to the cars when he went between them, and that the only movement of the cars thereafter was west. Could an engine have been coupled on the west without any jar or movement of the cars to the east? While Weed said that the engine was attached on the west, he also stated on cross-examination that he only saw it moving away after the movement west and did not see it uncoupled.

Whatever the effect of that circumstance alone might be, Weed's testimony lacks sufficient probative value to show that the man, to whom plaintiff said he talked, was the man who caused the cars to be moved. Weed was very uncertain about where he was when the switchman signaled. He placed himself, in most of his statements, about a car length east and two tracks north of the switchman, but also said both that the switchman was a car length beyond the opening, where plaintiff was, when he signaled, and that he signaled when only four or five feet from the opening. (He also gave this version: "Q. Now, as you came back, this fellow was about two car lengths ahead of you when you got to where Gus was? A. Yes.") According to one statement, Weed would have been about even with the opening (He said: "Almost"), when he saw the signal, but according to the other, he could not have reached it. (He said that he "hadn't gotten up to where Gus was then when he gave these signals.") In either case, how could Weed have seen plaintiff on the other side of the train (25 to 30 feet away at a right angle through an opening 3 feet wide) when he could see only the switchman's right hand, at the time he signaled, because of the position of the sack on his shoulder? (He even stated how much wheat plaintiff had in his sack.) And how could he know what plaintiff's position was when the switchman was at the opening? It seems beyond belief that, if Weed did see plaintiff, and then saw the switchman's signal, he could have been so unconcerned about what was happening. Furthermore, according to all of his positive statements, he was closer to plaintiff when he was injured than anyone else. Yet he did not hear his calls for help that were heard by men beyond the west end of the string of cars, and, according to plaintiff's own testimony, by the switchman who talked to him from the north side of the train. Thus it seems impossible to believe that, if plaintiff was injured by the movement Weed told about, he would not have heard plaintiff's calls. Moreover, plaintiff said that, when he was injured, the switchman who had talked to him from the north side of the train was the first man to him, and that he came from a point about five to eight cars from him. The switchman that Weed saw signal when he was going west on the north side of the cars "went the full length of the train" to the engine which Weed saw "back away from the cars."

Therefore, the switchman Weed saw and followed could not have been the switchman who talked to plaintiff and was the first man to him, because Weed walked behind the switchman he saw all the way to the west end of the cars, and plaintiff said that the cars moved within thirty seconds after the switchman left him.

This court cannot weigh the evidence in a law case but it does have the duty "to determine as a matter of law whether there is any substantial evidence to sustain an issue of fact." In doing this "the court may properly reject evidence which is contrary to the physical facts or to known physical laws, or which is the result of evident mistake or ignorance, or, in short, when the evidence itself, or the other established facts, discloses its inherent infirmity. In doing this, however, the court does not weigh the evidence in the judicial sense of that term." [Clark v. Bridge Company, supra.] We hold that plaintiff did not have any substantial evidence to show an essential fact element of his case; namely, that the cars were moved by or with the authority of anyone who had knowledge that plaintiff was in a position of imminent peril from such movement.

The judgment is reversed. *Ferguson* and *Bradley, CC.*, concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.