PURITAN PHARMACEUTICAL COMPANY, A CORPORATION, RESPONDENT, V. THE PENNSYLVANIA RAILROAD COMPANY, A CORPORATION, APPELLANT.—77 S. W. (2d) 508.

St. Louis Court of Appeals. Opinion filed December 31, 1934.

*Gus O. Nations* for respondent.

*N. W. Hartman* and *Fordyce, White, Mayne & Williams* for appellant.

SUTTON, C.—This is an action to recover damages for the loss of three shipments of toilet preparations delivered by plaintiff to defendant at St. Louis to be transported to pier 22, New York City. Defendant, admitting the three shipments of toilet preparations, set up as a defense to the action that the shipments were seized by federal prohibition officers, and also set up a counterclaim for freight charges.

The trial, with a jury, resulted in a directed verdict for plaintiff on both plaintiff's cause of action and defendant's counterclaim. Judgment was given accordingly. Defendant appeals.

The action of the court in directing a verdict for plaintiff on its cause of action and on defendant's counterclaim is assigned as error here.

There appears to be no dispute about the essential facts.

The first shipment in question was made on June 19th, the second on June 25th, and the third on July 2, 1929. All the shipments were consigned to the plaintiff with instructions to notify Da Bro Oil and Supply Company. The goods were contained in one-gallon cans, which were enclosed in wooden cases. Each shipment consisted of twenty-five cases. Each case contained twenty cans.

The first and second shipments were seized by federal prohibition officers in the Waverly Transfer Yards of the defendant company at Newark, New Jersey. The third shipment was seized at pier 22 in New York City.

It was conceded at the trial, and here as well, that plaintiff was duly notified of the seizures.

The federal officers who seized the shipments had no search warrant or other process. They had with them, and exhibited, their commissions or credentials as federal prohibition officers.

John G. Ayars, plaintiff's president, testified on behalf of plaintiff that the goods contained in the shipments were about eighty-five per

cent alcohol; that there was about eighty-five per cent alcohol, and the rest was perfume materials; that the greatest percentage of all perfumes in alcohol; that alcohol is used as a vehicle to carry the essential oils; that he did not mean when he said there was eighty-five per cent of alcohol in this perfume that it was alcohol in the general term, that he meant denatured alcohol, specially denatured alcohol; that alcohol in the general term is alcohol which is potable—fit for beverage purposes; that specially denatured alcohol, which plaintiff used for making perfumes, is denatured with poison materials unfit for beverage purposes; that this perfume was not fit for use as a beverage on account of the denaturizing substances, which was poison; that all three of these shipments were labeled with red labels indicating inflammable material.

Michael Tettelbaum, a watchman in the employ of defendant, testified on behalf of defendant that when the first shipment arrived at Waverly Transfer Yards, Newark, New Jersey, the checker called his attention to the fact that the case was leaking; that he called the carpenter over and picked up a board and found it was a case of leakage; that he found a can with a part of the seam bursted; that when he ordered the carpenter to open up the board he smelled an awful odor of alcohol, and then he went to see if there was a red label; that they regularly had a danger label under the rules and regulations; that when he got the odor of alcohol he notified Mr. Kohler, the chief clerk; that when the second shipment came in the same thing occurred, and he again notified Mr. Kohler; that he placed it on the platform and got hold of the carpenter and gave him red labels to place on the cases; that there was no leakage in the third shipment; that if there had been he would have notified the carpenter.

Arthur B. Cole, transfer agent at the Waverly Yards, testified on behalf of defendant that two of the shipments arrived at the Waverly Yards in a leaking condition; that one or two cases were leaking in the shipments; that when the first shipment arrived the freight handlers assigned to handle the freight in this particular car, when they came to move the shipment, discovered one of the cases leaking and, carrying out their instructions, they did not load it in the car to New York, but it was sent out to the cooper's port to have it examined; that the watchman came to him and said that he had this shipment and it had quite a strong odor of alcohol; that they examined the shipment and on account of it being alcohol put it in what he considered an inflammable commodity requiring certain protection to prevent fire; that these cases not having those protection labels on he thought possibly there might be some violation of the rules and regulations covering the handling of inflammable articles; that the rules and regulations required that certain red labels had to go on inflammable matter; that he immediately notified the Bureau of Explosives;

that their inspector came out and made some tests; that he could not recall who notified the prohibition officers to come out and make a test on the shipments; that someone in his office did it; that representatives of the prohibition department came to his office and asked to see him; that he could not say how they happened to come; that he could not say definitely whether anybody in his office called them; that the only thing he had definite knowledge of was that they told him it was contraband and that they were going to seize it; that they took the shipment; that when the second shipment arrived practically the same thing happened to it; that it was leaking and it went through practically the same process; that the first thing he knew about this shipment the prohibition officers came up and said that they wanted to take that shipment; that that was the first he knew it was there; that when they came out this time the process was the same as before; that when the third shipment arrived it was not leaking; that they applied the red labels to each case and placarded the car and sent it on to destination; that they put red labels on each case to indicate that it contained inflammable matter, and put a large red label on the car; that he did not notify anybody connected with the prohibition department about the movement of that merchandise; that he at no time consented to turn this shipment over to the prohibition officers.

Clifford Brinckerhoff, a prohibition officer, testified on behalf of defendant that on July 15, 1929, he participated in the seizure of some merchandise from the Pennsylvania Railroad on pier 22 in New York City; that there were twenty-five wooden cases marked "Carnation Bouquet Toilet Preparation;" that the merchandise, as shown by the bill of lading, was consigned to Puritan Pharmaceutical Company and notify Da Bro Oil and Supply Company, 254 Water street, New York City; that he saw the bill of lading through Mr. Chapin, the Pennsylvania Railroad delivery clerk; that the delivery clerk pointed out to him the merchandise; that he and Mr. Kania, a prohibition officer, seized the merchandise; that the merchandise was seized at pier 22, East River, freight station of the Pennsylvania Railroad; that they arrived at the pier at about 9:30 A. M. and went right to Mr. Chapin; that when they made the seizure they had no writ or warrant of any kind.

James F. Chapin, defendant's delivery clerk, testified on behalf of defendant that he remembered that several prohibition officers came to the pier and made seizure of a shipment, but not having his records before him he could not say that it was the particular shipment involved here.

Abraham Miller, chief prohibition inspector at Newark, New Jersey, testified on behalf of plaintiff that he received a message from a gentleman by the name of Kohler with reference to a shipment at Waverly

Transfer Yards shipped by the Puritan Pharmaceutical Company of St. Louis; that Mr. Kohler stated that there was a shipment of alcohol in the possession of his railroad which was in a leaking condition; that he did not go personally to see the shipment; that he assigned two inspectors and instructed them to inspect the shipment; that they took samples of the shipment and submitted them direct to the local United States chemist; that he instructed those inspectors to seize that particular shipment; that his recollection was that the Pennsylvania Railroad called his attention to the second shipment; that he did not know whether it was Mr. Kohler or some other person; that he did not recall what was done about that; that the first day samples were taken and the next day the seizure was made; that he did not remember what disposition was made of the bulk of the merchandise so far as his department was concerned; that the first information in regard to the shipment was received by Ludo Pickett, assistant prohibition administrator, and that information was to the effect that a shipment of alcohol was leaking at the Waverly Yards of the Pennsylvania Railroad; that he never saw the goods that were seized; that the original information that he got was from Mr. Pickett; that he himself had nothing to do with the actual seizure of these cases, that is, as to the physical handling of the cases; that he understood that Mr. Pickett got the first word from the railroad; and that thereafter he called the Pennsylvania Railroad himself and talked to someone who represented himself to be Mr. Kohler about it; that after Mr. Pickett got in touch with him then he got in touch with the Pennsylvania Railroad.

It is not contended that the goods seized were other than bona fide toilet preparations unfit for beverage purposes. The cause is not presented here, nor was it pleaded or tried below, on that theory.

At common law a carrier could escape liability for failure to deliver goods received for carriage only by showing that such failure was caused by an act of God or the public enemy, but this rule has been modified so as to excuse the carrier from liability where the goods are seized and taken from the carrier's possession, without the procurement or connivance of the carrier, by an officer of the law having authority to make such seizure, or acting under process valid on its face, provided the carrier gives prompt notice of the seizure to the consignor. [Danciger v. A. T. & S. F. Ry. Co. (Mo. App.), 179 S. W. 800; idem, 212 S. W. 5; Nickey v. St. Louis, I. M. & S. Ry. Co.; 35 Mo. App. 79; Shannon v. Hines, 205 Mo. App. 629, 226 S. W. 283; Chicago, B. & Q. R. Co. v. Fowler (Mo. App.), 27 S. W. (2d) 72; Brandom v. Power (Mo. App.), 41 S. W. (2d) 879; McAlister v. Chicago, R. I. & P. R. Co., 74 Mo. 351; Pingree v. Detroit, Lansing & Northern R. Co., 66 Mich. 143; Jewett v. Olsen, 18 Ore. 419; Southern Ry. Co. v. Heymann, 118 Ga. 616; Ohio & Mississippi Ry. Co. v.

Yohe, 51 Ind. 181; Railroad Co. v. O'Donnell, 49 Ohio St. 489; Stiles v. Davis & Barton, 66 U. S. 101.]

If the process is valid on its face the carrier need not go behind it to ascertain whether or not it is in fact valid. But, where the seizure is made without process it must appear that the officer was authorized under the law to make the seizure. In the present case the officers had no warrant or other process unauthorizing them to seize the plaintiff's goods. It only remains therefore to inquire whether or not they were authorized to seize the goods without process. If the officers were not authorized to make the seizures, they were mere trespassers, and they were no less trespassers because they were officers.

Section 40, Title 27, of the National Prohibition Act, U. S. C. A., on which defendant relies provides inter dlia as follows:

"When the commissioner, his assistants, inspectors, or any officer of the law shall discover any person in the act of transporting in violation of the law, intoxicating liquors in any wagon, buggy, automobile, water or aircraft, or other vehicle, it shall be his duty to seize any and all intoxicating liquors found therein being transported contrary to law. Whenever intoxicating liquors transported or possessed illegally shall be seized by an officer he shall take possession of the vehicle and team or automobile, boat, air or water craft, or any other conveyance, and shall arrest any person in charge thereof."

Defendant here contends that under this statute the prohibition officers were authorized to seize the plaintiff's goods. We do not think the statute admits of such a broad construction. The authority to seize, without warrant, given by this statute, is limited to goods being transported in a wagon, buggy, automobile, water or aircraft, or other vehicle and found therein. If at the time of the seizure the officer has, from facts ascertained through the exercise of his senses, or from other sources of information, reasonable or probable cause for believing that intoxicating liquor is being transported in any such vehicle contrary to law, the seizure is authorized; but the authority thus given is an exception to the general rule, and does not apply to stores, dwellings or other structures. [Carroll v. United States, 267 U. S. 132; Taylor v. United States, 286 U. S. 1; Peru v. United States, 4 Fed. (2d) 881; Park v. United States, 294 Fed. 776; Milam v. United States, 296 Fed. 629; Ash v. United States, 299 Fed. 277; United States v. Vatune, 292 Fed. 497; Husty v. United States, 282 U. S. 694.]

We do not see how this section can be made applicable to railroad transportation unless we discard the rule of construction known as the ejusdem generis rule, that, where general words is a statute follow specific words, designating special things, the general words will be considered as applicable only to things of the same general character

as those which are specified. [Mangelsdorf v. Pennsylvania Fire Ins. Co. (Mo. App.), 26 S. W. (2d) 818.] In view of the fact that railroad cars and trains, and the manner of their use in transportation, are so widely different in their general character from the various vehicles and craft specifically mentioned in the statute, and in view of the further fact that the various railroad systems occupy such a large field in the transportation of merchandise in this country, it is difficult to believe that the omission to mention in the statute a railroad car or train resulted otherwise than by design. Indeed, the mention of a railroad car or train appears to have been studiously avoided. The reason for this is obvious. Railroads are engaged in general commerce, rendering a public service. The cars and trains are operated on and confined to tracks, and are run from station to station according to designated schedules. Their routes and destinations are matters of public knowledge, or are easily ascertained. It was doubtless thought both unnecessary and unwise to authorize prohibition officers to interrupt or interfere with such public service, without a warrant or other process. That intolerable consequences would almost certainly ensue from the commission of such powers to prohibition officers becomes obvious upon the slightest reflection.

On the other hand, automobiles and other like road vehicles are usually employed for private purposes. They are not confined to any particular track or roadway. Their routes and destinations are not generally known. They are light and wieldy, and may be easily and speedily moved from place to place and to unknown destinations, or may be readily put into hiding. The same is true of airplanes, motor boats, and other small craft. So that searches and seizures respecting such vehicles and craft, without warrants, become necessary to the effectual enforcement of the law.

However, if, notwithstanding the *ejusdem generis* rule, it may be said that the statute applies to railroad cars and trains, as well as to automobiles and other road vehicles, and water and aircraft, still in the instant case the fact remains that the goods seized by the prohibition officers were not when seized being transported in any sort of a vehicle, but were resting in the warehouses of the defendant railroad company. It may be that the goods were still in course of transportation, but the statute does not authorize the seizure of goods discovered merely in course of transportation. The wording of the statute is peculiar. It provides that when any officer shall discover *any person in the act of transporting* in violation of law, intoxicating liquors *in any wagon, buggy, automobile, water or aircraft, or other vehicle*, it shall be his duty to seize any and all intoxicating liquors *found therein being transported* contrary to law.

We can see no escape from the conclusion that the seizure of plaintiff's goods was palpably unauthorized and unwarranted, and

constitutes no defense to the plaintiff's action. Under the undisputed facts it is clear that plaintiff was entitled to a directed verdict on its cause of action.

It is pertinent to observe that we are not concerned here with a seizure made in connection with an authorized arrest.

It should be observed, too, that the Danciger case, much relied on by defendant, was ruled on a statute widely different from the statute under review here.

We can see no merit in the contention that the court committed error in directing a verdict for plaintiff on defendant's counterclaim for freight charges. It is clear, from what has already been said, that defendant was not entitled to recover freight charges. Moreover the instruction directing a verdict for plaintiff on its cause of action expressly required the jury to deduct freight charges from the damages allowed.

The commissioner recommends that the judgment of the circuit court be affirmed.

PER CURIAM:—The foregoing opinion of Sutton, C., is adopted as the opinion of the court.

The judgment of the circuit court is accordingly affirmed. *Hostetter, P. J.,* and *Becker* and *McCullen, JJ.,* concur.