Joe CAPRA, Frank Accurso, Sam Accurso and Jack Accurso, Respondents,

v.

PHILLIPS INVESTMENT COMPANY, a Corporation, and Hotel Phillips, Inc., a Corporation, Appellants.

No. 44784.

Supreme Court of Missouri.

En Banc.

June 10, 1957.

Albert Thomson, Clem W. Fairchild, Al Lebrecht, Kansas City, Davis, Thomson, VanDyke & Fairchild, Kansas City, of counsel, for plaintiffs-respondents.

Harry L. Jacobs, Robert J. Coleman, Kansas City, for appellant, Phillips Inv. Co.

Clyde J. Linde, Robert J. Coleman, Robert B. Langworthy, Billy S. Sparks, Kansas City, Langworthy, Matz & Linde, Ringolsky & Jacobs, Kansas City, of counsel, for appellant, Hotel Phillips, Inc.

BOHLING, Commissioner.

Joe Capra, Frank Accurso, Sam Accurso and Jack Accurso, plaintiffs, recovered a judgment on a nine-juror verdict for $48,000 against Phillips Investment Company and Hotel Phillips, Inc., corporate defendants, sometimes herein referred to as Investment company and the Hotel, respectively, for the destruction by fire on the morning of December 14, 1952, of a restaurant and tavern, known as the Ringside Grill, owned and operated by plaintiffs as partners, on the submitted grounds that Phillips Investment Company breached a lease with plaintiffs in permitting Hotel Phillips, Inc., sub-lessee, to repair and refinish furniture and mattresses and to store certain combustible materials on leased premises in the building in violation of §§ 17–27, 17–39 and 17–44 (hereinafter quoted) of the Kansas City Fire Prevention Code; and for negligence on the part of Hotel Phillips, Inc., in repairing and refinishing furniture and mattresses and in storing said materials on said premises in violation of said ordinance provisions, all of which directly resulted in the spread of the fire to the premises occupied by plaintiffs. Defendants contend plaintiffs failed to prove a case against either defendant; that error was committed in the admission and exclusion of evidence, in the giving of instructions and that the damages are grossly excessive.

The building, two stories, facing west and known as 1113–1115 Wyandotte, a north-south street, was 50 feet wide and extended 142 feet eastwardly to an alley. It had an east-west center partition and front-center entrances and stairways to the second floors and basements. Elevator shafts were at its southeast and northeast corners. The alley, 16 feet wide, was approximately 10 feet lower than Wyandotte street. The basement was at the alley level, and the building appeared to be three stories on the alley side. Immediately south of the building was the State Hotel, occupying a 50 by 142 foot

lot at the intersection of Wyandotte and 12th, an east-west street. Across the alley and extending northwardly from the intersection of 12th and Baltimore, the next street east of Wyandotte were, respectively, the Hotel Phillips (a 23-story building opposite the State Hotel), the Hotel Phillips Annex (a three story building opposite 1115 Wyandotte), and the Hotel New Yorker (opposite 1113 Wyandotte), each 142 feet east and west by, respectively, 50, 25 and 25 feet. A footbridge or ramp crossed the alley from the roof of the Annex, angling slightly, so as to connect with the second floor above the Grill.

Hotel Phillips, Inc., operates the Hotel, with bars, restaurants and rooms to accommodate guests. Phillips Investment Company is a family corporation trading in real estate.

Plaintiffs held a lease on 1113 Wyandotte street, Kansas City, Missouri, and in 1948, leased the second floor of 1113 Wyandotte to Phillips Investment Company. The lessee covenanted, among other things, in said lease: "to take good care of the premises, and keep them in good repair, free from filth, danger of fire or any nuisance" and "to comply with the ordinances of the City and the laws of the State and save harmless the Lessors for or on account of all charges or damages for non-observance thereof."

The Ringside Grill (1113 Wyandotte) occupied the north half of the first floor and basement of the building. Sammy Farha had a tailoring and cleaning shop in the west 58 feet of the south half (1115 Wyandotte) of the building. The Grill, under arrangements had in connection with the above lease, used the next 40 feet to the east as a banquet room.

The remainder of the building was occupied by the defendants with the Hotel in possession as sub-lessee of the Investment company. The Hotel used the east 34 feet of the first floor of 1115 Wyan-

dotte as a storeroom. A hallway extended down the center of the second floor. South of the hallway and above the tailor shop was an apartment, occupied by George Howell, chief engineer for the Hotel. The other rooms on the top floor were used by the Hotel for the storage of furniture, mattresses, rugs and rug pads, baggage, et cetera and two rooms for old records. There was also an upholstery repair shop with upholstery material, and a carpenter repair and finishing shop. This is developed more fully hereinafter. The rooms were not fireproof.

There was testimony that the building was 30 or 40 years old. It was of wood and brick construction. An east-west center row of metal columns, with steel I-beams, carried the floor system, with the outward ends of the joists built into the brick walls. The Grill's ceiling was pressed metal throughout. It was originally about 11 feet high, and had been furred down to about 10 feet from the front to the end of the bar. The floor of the Grill was pine, with a maple floor over it and asphalt tile over that extending back east to the kitchen doorway. The second floor flooring was maple on top of sub-flooring. The Grill's main dining room extended east 90 or 92 feet. Along the north wall for about 15 feet was the front kitchen for short orders, a steam table and range, and east of that a 35 foot bar with 15 to 20 stools. Booths and tables for serving approximately 100 occupied the remainder of the main dining room. There was a partition at the east end of the dining room, with swinging doors on the south leading into a corridor of about 8 feet, which proceeded northwardly a few feet and thence, narrowing, eastwardly to the back kitchen. The restrooms were off of this corridor along the north wall, and south of it was a balcony or mezzanine, said to be 18 by 21 feet, used as an office and reached by enclosed steps at its southwest. The east, approximately, 25 feet was a kitchen, used to prepare the food

for the lunches served from the front kitchen. After the lunch hour, or about 2 p. m., the back kitchen was closed and the front kitchen was used to serve food and prepare short orders.

Defendants contend plaintiffs had no substantial evidence that the fire originated on defendants' premises. Defendants adduced substantial evidence that the fire originated in plaintiffs' Grill in the corridor south of the restrooms, east of the swinging doors of the partition, and near or at the steps leading to plaintiffs' balcony, approximately 100 feet east of Wyandotte street and 40 feet west of the alley.

Plaintiffs say their evidence established that the fire started on defendants' premises, but even if it did not defendants are liable for the damage caused by their violation of the ordinances hereinafter discussed. We find no evidence in the record that the fire originated any place other than on the premises of either the defendants or the plaintiffs. No case cited by plaintiffs holds a defendant liable for a fire which originated on the plaintiff's premises. They are to the effect that although the defendant be not negligent in starting a fire on his premises or if a third person start a fire and the fire spreads to plaintiff's premises by reason of negligence chargeable to defendant, the plaintiff may recover. Steele v. Darner, 124 Mo.App. 338, 103 S.W. 582; Willard v. Bethurem, Mo.App., 234 S.W.2d 18, 21 [1]; Steffens v. Fisher, 161 Mo.App. 386, 394, 143 S.W. 1101, 1103; Texas & N. O. R. Co. v. Bellar, 51 Tex. Civ.App. 154, 112 S.W. 323, 325; Lawrence v. Yadkin River P. Co., 190 N.C. 664, 130 S.E. 735 [5, 6]; Silver Falls Timber Co. v. Eastern & W. Lumber Co., 149 Or. 126, 40 P.2d 703, 710, 733; Prince v. Chehalis Savings & L. Ass'n, 186 Wash. 372, 58 P.2d 290 [1], 61 P.2d 1374; 22 Am.Jur. 603, n. 21, citing Rudder v. Koopman, 116 Ala. 332, 22 So. 601, 37 L.R.A. 489. The essential fact on this phase of the instant case is whether plaintiffs had probative evidence that the fire originated on defend-

ants' premises. Consult Annotation, 18 A.L.R.2d 1081.

█ It is well settled, Machens v. Machens, Mo., 263 S.W.2d 724 [16], that for the purposes of appellate review a plaintiff's verdict (defendant's motion for new trial standing overruled) is final on the fact issues if supported by substantial evidence; and whether plaintiff made a submissible case is determined in the appellate courts by a review of the probative facts not entirely unbelievable or opposed to the physical facts, Ducoulombier v. Thompson, 343 Mo. 991, 124 S.W.2d 1105 [5, 6] from the standpoint most favorable to the plaintiff, including facts established by defendant's evidence aiding plaintiff's case when not in conflict with plaintiff's testimony or plaintiff's fundamental theory, giving plaintiff the benefit of all legitimate favorable inferences and disregarding defendant's evidence unfavorable to plaintiff. Catanzaro v. McKay, Mo., 277 S.W.2d 566 [1]; Sollenberger v. Kansas City Pub. Serv. Co., 356 Mo. 454, 202 S.W.2d 25 [2]; Hines v. Western U. Tel. Co., 358 Mo. 782, 217 S.W.2d 482 [1]. In the circumstances presented we do not weigh conflicting probative evidence. State ex rel. Kansas City Public Service Co. v. Bland, 353 Mo. 1234, 187 S.W.2d 211 [6]; Wilcox v. Coons, 362 Mo. 381, 241 S.W.2d 907 [25].

James Pebley, defendants' witness and extra fire marshal for the Hotel, worked Saturday nights. He testified he checked the Hotel premises every hour and a quarter. He had been on the floor above the Grill between 1:05 and 1:10 a. m., where a 60-watt bulb lighted the hallway. He carried a flashlight. He was there about two minutes and noticed nothing unusual. He did not see into the carpenter shop, the baggage, the record or the upholstery rooms. He discovered smoke coming out of a vent at the top of the Grill's rear windows underneath the ramp when in the alley on his way to check the Hotel laundry in the basement. Pebley immediately notified Fred J. Titus, the house officer, and

Mr. Reardon, the night clerk, who went to the alley, saw the smoke coming from the vent, and turned in the alarm at a fire box (known as a "still" alarm) at 12th and Baltimore. They notified the Hotel guests.

This alarm was received at the fire station about three blocks from the fire at 1:26 or 1:27 a. m. December 14, 1952. Captain James E. Koberstein of a pumper company answered the alarm, was directed to the alley by Mr. Titus, saw heavy smoke coming out below the ramp, and immediately turned in a "regular" alarm over his "two-way" radio. This alarm was received at 1:28 a. m. and called for additional fire fighting equipment. At 1:45 a. m. a "general" alarm was turned in.

Roy Brown, captain of headquarters No. 1 hook and ladder, whose duties embraced locating fires, arrived at the scene about two minutes after Koberstein. Brown and Frank Criscione, one of Brown's men, ran toward the heavy smoke in the alley. Brown stated smoke usually rises but when confined will go down. In about 30 seconds Brown heard some windows "pop out." He looked up and "as the fire popped out of the window I could see the catwalk." This was the first flame he saw and it was on the top floor of the building. Chief Grass ordered Brown to the front of the building where two people were reported trapped. Criscione corroborated Brown, stating that just as they were ordered to the front he saw a flame from the top floor of the building, about 35 feet above him. Brown estimated they had been in the alley less than a minute.

The smoke was very dense at the front of the building, the first and second floors being full of smoke, but the Grill windows and doors were intact. While Brown's men were putting a ladder to the second floor, Mr. and Mrs. Howell, who had the apartment, ran out. Brown testified this investigation took a matter of seconds, not minutes; estimating 30 seconds.

Captain Brown testified that as soon as the Howells came out he was ordered to

see how much fire there was on the first floor; that he put on a mask; that the front door was forced open but the windows were intact; that he took a 2½ inch line into the building; that the smoke was heavy and it was very hot; that it would be "hard to see the partition with a gas mask on and the building full of smoke" but it would not be difficult to see flame; that he knew the Grill floor plan and went back two-thirds or better into the Grill, "got back to the swinging doors"; that there was "popping and cracking" above him and it appeared to him all the fire was above the Grill; that he could find no flame or fire inside the Grill and he threw no water in there whatever. He was then ordered to put his aerial apparatus to work. He stated the fire went through the roof in 15 or 20 minutes and not one out of 300 or 400 fires goes through that fast.

Criscione entered the Grill with Brown. Each had a four-battery lantern, which gave "quite an amount of light." Criscione testified that he did not wear a mask; that there was a great amount of smoke and heat and after proceeding about 50 or 60 feet he was ordered not to go any farther without a mask; that Brown went on and while he could not see Brown he could see Brown's lantern and it disappeared at the doorway from the dining room to the kitchen. They were in the Grill about two minutes. He saw no fire in the Grill then. The first fire or flames he saw on the first floor was after the second floor collapsed.

Plaintiff Capra, manager of the Grill, and Andy Distasio, the bartender, as was the custom, checked the Grill's premises to see that things were all right for closing and, finding everything in proper shape, locked up, leaving between 12:30 and 12:45 a. m. Capra, informed of the fire, returned about 1:40 or 2:00 a. m. As he approached he saw smoke and fire on the roof. About 40 or 45 minutes later, he and several firemen brought out the Grill cash registers. He went to about the center of the bar, was in there 3 to 5 minutes, and saw no flame in the Grill. Later, in the alley, he saw flames

on the roof, but none through the rear windows of the Grill. He was at the front when the roof fell in and later the ceiling of the Grill. He then first saw flames in the Grill.

The fire gutted the building. The damage on the Grill floor was greatest in the vicinity of the balcony, but pictures of fighters stored over the restrooms by plaintiffs and found under other debris had only the edges charred. Space forbids covering all the details.

Frank L. Duclos, for plaintiffs, and Elza O. Holmes, for defendants, testified as expert witnesses. Defendants contend the court erred in permitting Mr. Duclos to state opinions not supported by substantial evidence and to give expert testimony concerning simple matters.

■■■ The origin of the instant fire was not so simple a matter on the conflicting evidence as to preclude expert testimony. Both parties offered it. We agree with defendants that it is proper and not error to exclude the opinion of expert witnesses on matters of common knowledge as such testimony does not aid the jury. Cole v. Empire Dist. Elec. Co., 331 Mo. 824, 55 S.W.2d 434, 437 [3, 4], holding, under undisputed and relatively simple facts, that the exclusion of an expert's opinion as to what caused a fire was not error. All opinion testimony conforming to common knowledge is not reversible error. We consider Mr. Duclos' statement to the effect that a room filled with combustibles would be highly hazardous if it became ignited was not prejudicial. Buttron v. Bridell, 228 Mo. 622, 629(II), 129 S.W. 12, 13(2); McCollum v. Smith, Mo.App., 199 S.W. 271 [3].

Mr. Duclos had investigated many fires, having had 23 years experience. His qualifications were not questioned. He was at the scene on the second day after the fire and during the removal of the debris, which extended into 1953. He referred to photographs taken during the removal of the

debris and offered in evidence, stated facts he found during his investigation and his conclusions. He testified he found no pattern of heat travel through the front or back windows of the Grill and that such facts gave him an "awful good indication" that no flames ever went through the windows, adding: "You cannot be certain of anything except death, but we watch for this very carefully"; that wooden trays by the rear windows of the Grill were not charred and showed no smoke damage; that the ceiling of the rear kitchen remained in place, had been subject to intense heat by convection, and showed charred from up above, and that such facts "along with other patterns I found, convinced me that the fire was not on the first floor except as it tumbled down from above." Plaintiffs' counsel, in a hypothetical question, assumed that specified combustible materials were on the second floor, the facts ascertained by the witness' personal observations and in evidence, other facts in evidence, and complying with all suggestions of counsel for defendants offered in connection with the question, see Dodd v. Missouri-K.-T. R. Co., 353 Mo. 799, 184 S.W.2d 454, 456 [3], asked the witness whether "in your opinion were they the cause of the damage to the Ringside Grill." He answered: "As outlined by your question there, my opinion would be yes. Q. Your opinion is yes? A. Yes." He was then asked: " * * * in your opinion was the damage to the property of the Ringside Grill which was suffered in this fire the natural and probable consequence of the conditions existing on the second floor of said building * * *? A. I am just at a little loss how to explain that; however, on the basis as you mentioned it, my answer would be yes."

■ The admission or exclusion of expert opinion testimony is largely within the sound discretion of the trial court. Eickmann v. St. Louis Pub. Serv. Co., 363 Mo. 651, 253 S.W.2d 122, 130 [11]; Fair Merc. Co. v. St. Paul Fire & M. Ins. Co., 237 Mo.App. 511, 175 S.W.2d 930, 934 [3–7]. "An expert witness, necessarily, states his conclusions about certain matters which would not be permitted of other witnesses. As long as his opinion is not a mere guess or conjecture, but is based upon facts or adequate data, it is properly received." Vitale v. Duerbeck, 338 Mo. 556, 92 S.W.2d 691, 695 [8]; Golden v. National Utilities Co., 356 Mo. 84, 201 S.W.2d 292, 295 [2–7]. Unlike Gaddy v. Skelly Oil Co., 364 Mo. 143, 259 S.W.2d 844, 849 [9, 10, 13], we consider plaintiffs' expert's opinion to be based on substantive evidence. The weight of his testimony was for the jury. We sustain the trial court's ruling.

■ Notwithstanding the showing made by defendants, we conclude that under the conflicting evidence whether the fire originated on plaintiffs' or on defendants' premises was for the jury.

Plaintiffs took Charles E. Phillips' deposition December 24, 1952. He was 75 years old, was an officer of Hotel Phillips, Inc., had an office in the Hotel and was chairman of the board and a director of defendant corporations. At the time of trial he was ill and in Denver, Colorado. See § 492.400—statutory references are to RS Mo 1949 and V.A.M.S. The notary-reporter, after requests for deponent to appear and sign his deposition, filed it on April 23, 1953. Later, at the request of defendants' counsel, the notary went to Hotel Phillips where Mr. Phillips, in the presence of counsel and the notary, made eleven changes in the deposition and subscribed and swore to it. The notary notified the parties of the changes October 20, 1953. At a hearing in chambers where the parties presented their positions on the admissibility of the original answers in evidence, the notary testified that she had properly transcribed the witness' original testimony (which conformed with the certificate attached to the deposition); testified as to each of the several changes made in the testimony, and that she did not remember of any reason being given for or having any particular conversation with the witness about the changes.

Plaintiffs' counsel read to the jury the deposition as corrected and thereafter the question and original answer of the witness. Defendants contend reading the original answers was error.

The changes converted affirmative answers to negative answers and were material in plaintiffs' view of the case. Illustrative are: Asked: "Was all of your painting and refinishing done on those premises," deponent answered: "A. The furniture repairing was practically all done there, unless it might be some minor job when you would tell a carpenter to go to a room and fix it right there, you know. Q. The same way with a refinisher? A. Yes." Changed answer: "A. No." "Q. That was clear at the front, was it, where this painting and refinishing was done. A. Yes." Changed answer: "A. Painting and refinishing was done only in the main hotel building."

Section 492.350, in effect for many years, provides that the certificate of the officer shall show "that the deposition or examination * * * was subscribed and sworn to by the witnesses * * *."

Section 492.340 is part of our New Code of Civil Procedure. Laws 1943, p. 396, § 144. It reads:

"When the testimony is fully transcribed the deposition shall be submitted to the witness for examination and shall be read to or by him, unless such examination and reading are waived by the witness and by the parties. Any changes in form or substance which the witness desires to make shall be entered upon the deposition by the officers with a statement of the reasons given by the witness for making them. The deposition shall then be signed by the witness, unless the parties by stipulation waive the signing or the witness is ill or cannot be found, or is dead or refuses to sign. If the deposition is not signed by the witness, the officer shall sign it and state on the record the fact of the waiver or of the illness, or death or absence of the witness or the fact of the refusal to sign together with the reason, if any, given therefor; and the deposition may then be used as fully as though signed, unless on a motion to suppress the court holds that the reasons given for the refusal to sign requires rejection of the deposition in whole or in part."

Section 492.340 is practically identical with Federal Rule of Civil Procedure 30(e), 28 U.S.C.A. We are referred to and find no Federal case passing on the issue presented.

Cases prior to the enactment of § 492.340 hold a deponent has the right to correct his answers before signing his deposition, Gosney v. May Lumber & C. Co., 352 Mo. 693, 179 S.W.2d 51, 53 [5], and that a deposition is not the witness' deposition until signed, Davis v. Otto, Mo.App., 206 S.W. 409, 410 [6–8]. Under these cases the changed answers and not the original answers were the witness' deposition. A deponent's signature is not essential in every instance. Will Doctor Meat Co. v. Hotel Kingsway, Inc., Mo.App., 232 S.W. 2d 821, 825 [5]. The instant suit is against corporate defendants. Mr. Phillips was not a defendant, and his original answers were not admissions by the corporate defendants against interest. Meyer v. Dubinsky Realty Co., Mo.App., 133 S.W.2d 1106, 1110 [10]; Kolb v. Howard Corp., Mo.App., 219 S.W. 2d 856, 859 [3]. See also Accomac Realty Co. v. City of St. Louis, 347 Mo. 1224, 152 S.W.2d 100, 103 [3]; Winegar v. Chicago, B. & Q. R. Co., Mo.App., 163 S.W.2d 357, 367 [13, 14]. Defendants also say the original answers were inadmissible on the ground a party may not call a witness and then impeach his testimony by proving prior contradictory statements; and, with the trial occurring approximately a year after plaintiffs were notified of the changes, plaintiffs may not successfully claim surprise or entrapment. Crabtree v. Kurn, 351 Mo. 628, 173 S.W.2d 851, 858 [9–12]; Conner v. Neiswender, 360 Mo. 1074, 232 S.W. 2d 469, 473 [8–10]; Hayes v. Kansas City So. R. Co., Mo., 260 S.W.2d 491, 494 [1, 5].

Section 492.340 effected changes for the taking and admission in evidence of depositions. After providing for the witness making the changes he desires and a statement of the witness' reasons by the officer, and the signing by the witness, unless for stated reasons the deposition is not signed and the officer stating said fact, with the reasons, on the record, the section provides: "and the deposition may then be used as fully as though signed, unless on a motion to suppress the court holds that the reasons given for the refusal to sign requires rejection of the deposition in whole or in part." There is no motion to suppress of record, and the notary testified she did not remember any reasons being given by the witness for the changes made in the deposition. A witness at the trial may correct his testimony and give his reasons for doing so. We know of no rule where a deposition has been offered in evidence prohibiting a witness from taking the stand at the trial and correcting his deposition, and if the correction be made for alleged error in transcribing the deposition, the officer taking the deposition may be called in rebuttal to establish the correctness of the original answers. 4 Jones 3731, § 2014. Unless the deposition be suppressed in whole or in part, we conclude § 492.340 contemplates that when a witness is sworn to testify to the truth, as here, his original answers, as well as his changed answers, with his reasons, if any, therefor, upon his renewed oath constitute his deposition. Consult Healer v. Kansas City Pub. Serv. Co., Mo., 251 S.W.2d 66, 69 [6].

Plaintiffs also contend the original answers were admissible as declarations, as distinguished from admissions, against interest, citing Neely v. Kansas City Pub. Serv. Co., 241 Mo.App. 1244, 252 S.W.2d 88, 91 [1–6]; Osborne v. Purdome, Mo., 250 S.W.2d 159, 163, among others. We need not develop the issue.

Defendants contend the court erred in permitting §§ 17–27, 17–39 and 17–44 of an ordinance of Kansas City "Providing for Fire Prevention and Fire Protection, to be known as the Fire Prevention Code," to be read in evidence and plaintiffs' case to be submitted on the alleged violations of said sections, because they were not applicable, or, if applicable, were not shown to have been violated. The stated purpose of the ordinance (§ 17–14) is to safeguard persons and property from injury and damage by fire. We quote the ordinance provisions:

"Section 17–27. Inflammable rubbish. No owner, lessee, agent or person in charge of the operation of any building of a public or semi-public character where a number of people enter, work, assemble or reside, shall cause, permit or allow any inflammable rubbish such as excelsior, shavings, straw, chips, waste paper, trash and the like to be or remain in or about such building, unless placed in a metal-lined and metal-lidded box or bin with an automatic or self-closing cover, which shall be kept locked when not in actual use or baled as provided herein. No person making, using, storing or having charge or control of any shavings, excelsior, rubbish, sacks, bags, litter, hay, straw, or combustible trash, waste or fragments shall fail, neglect or refuse at the close of each day to cause all such material which is not compactly baled and stacked in an orderly manner to be removed from the premises or stored in suitable vaults or in metal-lined covered receptacles or bins as provided above. The Chief Fire Prevention Inspector shall require suitable baling presses to be installed in stores, apartment buildings, factories and similar places where accumulations of paper and waste materials are not removed at least every day. The provisions of section 17–44 shall be complied with where applicable to the subjects of this section."

"Section 17–39. Furniture repairing. The storage of old furniture, seat cushions, mattresses, packing material, broken boards or other similar combustible materials and shops for repairing or finishing furniture, mattresses, etc., in any hospital, theater, apartment, hotel or similar establishment is prohibited unless the room used for that purpose is a fireproof room in accordance

with requirements of chapter ten of the Building Code."

"Section 17–44. Combustible Fibers. The term 'combustible fibers' shall include cotton, sisal, henequen, ixtle, jute, hemp, tow, cocoa, fiber, oakum, baled waste, kapok, hay, straw, Spanish moss and excelsior. * * * b. Not to exceed one hundred cubic feet of loose combustible fiber may be kept in any building provided storage is in a metal-lined wooden bin, equipped with a self-closing metal-lined cover. * * *"

The Hotel used the floor above the Grill to store linens, drapes, new and used rugs, carpets and ozite or rug pads made out of jute and hair, mattresses, regular and cot sizes, divans, furniture and the old records of the Hotel. Also, there was a carpenter shop for the repair of Hotel furniture and an upholsterer's shop for the repair of mattresses and overstuffed furniture. The upholsterer's tools and materials were kept there. Cotton was purchased by the 100 pounds and used to repair chairs and box spring mattresses. The old rugs and carpets were in a pile on the floor, as were the rug pads. Old Hotel records, such as guest checks, were tied together, filed in cardboard filing boxes and placed on shelves in the record rooms. A box, containing ceiling fixtures packed in excelsior had been opened a short time before the fire. The fixtures were not used, and the box, with the excelsior and fixtures, was stored above the Grill on the top floor. After the fire witness Duclos found a quantity of loose excelsior where the Grill had been; but there is no showing that the excelsior so found had been affected by the fire and it could not have contributed to plaintiffs' loss.

Joe Capra testified that he last visited the top floor two or four weeks before the fire; that there was paint in the carpenter shop and a man was using paint or paint remover on a chair knob; that furniture was stored there, and rugs and rug pads were in piles on the floor. Frank Ac-

curso was last on the top floor December 1st or 2nd, 1952, looking for Mr. Van Hee. He testified someone was then using a paint brush on raw wood in the carpenter shop; that every time he had been there, he had seen gallon and half gallon cans of paint, and square cans of thinner on the shelves in the carpenter shop, also cans with brushes in them; that the record room was full of paper boxes, stacked to the ceiling; that the upholsterer's room was always dirty, with cotton and upholstery stuff on the floor; and that he had seen Mr. Van Hee painting up there.

Roy Thurman was the Hotel's maintenance man at the time. He was plaintiffs' witness. He was on the top floor one to three times a week and was there December 12, 1952. Things were piled around with nothing in its place in the storage rooms. Ozite rug pads, which felt oily, were in a pile on the floor. The general condition of the upholsterer's room was such that you couldn't get through. They had cotton padding and burlap strips in there, and cuttings of these materials were on the floor. He watched for things that might be salvaged for the Hotel after the fire and turned over to Mr. Van Hee five one-gallon cans of furniture oil found in the debris.

Plaintiffs called Lee Christofferson to the stand and established he was and had been the Hotel's upholsterer for 12 years; that upholstering material was kept in the upholsterer's room, cotton padding or batting, cotton covering, and webbing made out of jute or sisal, he thought jute; and that he kept the jute on top of a tin box. On cross-examination he testified he kept cotton batting and usable remnants in separate steel bins with self-closing lids; that he had one roll of jute webbing 3½ inches wide and 18 inches in diameter—two or three yards of it; that he had a steel barrel with a lid, for scrap leather, another about half full of hair from mattresses, and that rolls of cotton material were kept on a rack; that he worked until 3:30 the Saturday of the fire when, in accord

with his custom and daily practice, he swept and cleaned up and took the sweepings and burned them in an incinerator in the Hotel basement. On redirect examination he stated they quit repairing mattresses up there when the paint shop was moved, about 1949.

There was other testimony from which the jury could find that mattresses were repaired on the top floor up to the time of the fire; that the upholsterer's room was not kept in the condition and as clean as the upholsterer stated on cross-examination; and that the Hotel hauled its trash away and had no place to burn it. In addition, among other things, there was testimony that the fire traveled fast, went through the roof (about 1:45 or 1:50 a.m.) in 15 or 20 minutes after Captain Brown arrived; that not one fire in 300 or 400 goes through that fast; that the roof collapsed, then the second floor gave way, and then flames were first seen on the Grill floor. It is stated in 32 C.J.S., Evidence, § 1040, n. 41, page 1106, that a party is not bound by the unfavorable testimony of his witnesses "where the testimony is contradicted, either expressly or by inference, by other evidence or circumstances, as where the circumstances or the evidence of other witnesses would warrant the trier of facts in disregarding the testimony or drawing a contrary inference." See Mooney v. Terminal R. Ass'n, 353 Mo. 1080, 186 S.W. 2d 450, 454 [5]; Perryman v. Missouri P. R. Co., 326 Mo. 176, 31 S.W.2d 4, 7 [3]; De Lay v. Ward, 364 Mo. 431, 262 S.W.2d 628 [6].

We conclude that §§ 17–27 and 17–44 are broad enough to embrace defendants and that a jury could find or infer from the evidence most favorable to plaintiffs that the Hotel kept and the Investment company permitted the Hotel to keep combustible fibers, such as cotton, cotton padding, burlap strips, jute or sisal, excelsior, oily rug pads made of jute and hair, and combustible waste and fragments on the premises leased by plaintiffs to the In-

vestment company in violation of said ordinance provisions. Section 17–27 makes the provisions of § 17–44 applicable to the subjects of § 17–27.

Plaintiffs' position, with respect to § 17–39, is that the Grill for fire prevention purposes was a "similar establishment" to a hospital, theater, apartment or hotel because "they all have one thing in common"; that is, members of the public congregate in hospitals, theaters, hotels and restaurants. Webster's New International Dictionary, 2d Ed., defines "similar" as: "Nearly corresponding; resembling in many respects; somewhat like; having a general likeness." The evidence of plaintiffs Accurso and Capra and their bartender Distasio established that plaintiffs operated a bar and restaurant, selling drinks and meals or lunches to be consumed on the premises, and not an inn or hotel where guests were accommodated with rooms and meals.

Perhaps § 17–39 should have been worded to include buildings or establishments where the public congregate or assemble. Ordinances are not always drawn with the necessary care and precision. The city council knew how to include buildings or establishments where a number of people assemble if it intended § 17–39 to be so applied for § 17–27, quoted supra and relied on by plaintiffs, provides that "no owner, lessee, agent or person in charge of the operation of any building of a public or semi-public character where a number of people enter, work, assemble or reside, shall" et cetera. The ordinance provisions disclose an intention to distinguish between buildings mentioned in § 17–27 and establishments mentioned in § 17–39 by not including in § 17–39 buildings or establishments of a public or semi-public nature. "Where general words in a statute follow specific words, designating special things, the general words will be considered as applicable only to things of the same general character as those which are specified." Puritan Pharmaceutical

Co. v. Pennsylvania R. Co., 230 Mo.App. 848, 77 S.W.2d 508, 511; Zinn v. City of Steelville, 351 Mo. 413, 173 S.W.2d 398, 401[4]. *"Or similar establishments"* emphasizes the applicability of the rule of ejusdem generis to § 17–39. Establishments dissimilar to those specifically named are not included. Taverns, bars and restaurants are dissimilar with respect to the enumerated matters mentioned in § 17–39 (storage of old furniture, mattresses et cetera and shops for repairing and refinishing furniture and mattresses et cetera) to hospital, theater, apartment or hotel establishments. The fact that there was an apartment occupied by the chief engineer of the Hotel on the top floor did not make the building an apartment establishment. The construction given the Fire Prevention Code by the officials charged with its enforcement is not controlling. However, in this instance their action accords with the conclusion we reach. There was testimony from plaintiffs' witnesses as well as from defendants' witnesses to the effect that the Hotel had stored paint on the top floor; that the city inspector informed the Hotel the Fire Prevention Code required a fireproof room for that purpose, and that about three years prior to the fire the Hotel constructed a fireproof room in the Hotel for storing its paint. The city inspector made no like requirement with respect to the upholstery room or the carpenter shop. They remained located on the floor above the Grill. Ordinances of this nature usually carry penalties for their violation and are subject to strict construction. Ex parte Lerner, 281 Mo. 18, 218 S.W. 331, 333 [4]; City of Louisiana v. Bottoms, Mo.App., 300 S.W. 316 [2]. Giving § 17–39 a reasonable construction, the record does not establish that it applied, and the section should not have been read in evidence and submitted as a ground for recovery.

■ Ordinance provisions required reports in writing of fires to the Division of Fire Prevention by the fire officer in whose jurisdiction the fire occurred and required the Fire Prevention Division to keep records of all fires and of all facts concerning them, etc. Chief Grass, in whose jurisdiction the fire occurred, made a report. Chief Charles J. Saunders, in charge of the Prevention Division, also had Captain Koberstein make a report on December 23, 1952, Koberstein being the first fireman on the scene, and placed the report in the files as a part of the public record of the fire. Koberstein's report was excluded when offered by defendants. Speaking of a police report we have said: "There is a well-established exception to the hearsay rule admitting official reports made by an officer on the basis of his own personal investigation and knowledge, at least when required by statute, ordinance, rule or regulation." Snider v. Wimberly, 357 Mo. 491, 209 S.W.2d 239, 241 [1], which was decided prior to the "Uniform Business Records as Evidence Act." Laws 1949, p. 275; §§ 490.660–490.690. The factual statements in Koberstein's report within his personal knowledge were admissible upon a proper showing. Kansas City Stock Yards Co. v. A. Reich & Sons, Mo., 250 S.W.2d 692, 700 [18, 19]; State v. Hampton, Mo., 275 S.W.2d 356, 359 [6, 7]; State v. Baker, Mo., 276 S.W.2d 131, 134 [6].

Plaintiffs say the error was harmless as Koberstein testified to substantially the same facts for defendants. Boring v. Kansas City Life Ins. Co., Mo., 274 S.W. 2d 233, 238 [4–6]. This is the general but not the universal result. Koberstein's report was material on the origin of the fire, a hotly contested controlling issue on which the evidence conflicted, was made soon after the fire, and had probative value. The trial was had twenty-two months after the fire, and plaintiffs' counsel questioned the witness' recollection. The fact issue was a close one, resulting in a nine-juror verdict. Similar situations have been con-

sidered reversible error. Welp v. Bogy, 218 Mo.App. 414, 431, 277 S.W. 600, 604 [8], and cases cited.

We think we need not extend this opinion to develop the other issues. The instructions, no doubt, will be redrafted in accord herewith and in the light of the attacks against them.

The judgment is reversed and the cause remanded.

PER CURIAM.

The foregoing opinion by BOHLING, C., is adopted as the opinion of the court en banc.

HOLLINGSWORTH, WESTHUES, EAGER, STORCKMAN and LEEDY, JJ., concur.

DALTON, C. J., and HYDE, J., concur in result on the ground of error in the exclusion of Koberstein's report.